| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (01/25/17) CCG N001 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ACE AMERICAN INSURANCE COMPANY, ETC.

(Name all parties)

v.

BRIXMOR SPE 3 LLC, ET. AL.

No.

2017CH07300
CALENDAR/ROOM 15
TIME 00:00
Declaratory Jdgmt

### ☉ SUMMONS ◯ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room __802__, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Dr.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham 16501
S. Kedzie Pkwy. Markham,
IL 60428

☐ Child Support: 50 W.
Washington, LL-01,
Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☑ Atty. No.: __45609__

Name: __Jeanne M. Hoffmann/Bryce Downey & Lenkov LLC__

Atty. for: __Plaintiff__

Address: __200 N. LaSalle St., Suite 2700__

City/State/Zip Code: __Chicago, IL 60601__

Telephone: __(312) 377-1501__

Primary Email: __jhoffmann@bdlfirm.com__

Secondary Email: __jhoffmann@bdlfirm.com__

Tertiary Email:_____

Witness: __DOROTHY BROWN MAY 23 2017__

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:
(312)  377-1502
(Area Code)  (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**
Page 1 of 1

EXHIBIT
A

ACE AMERICAN INSURANCE COMPANY, ETC.
V.
BRIXMOR SPE 3 LLC, ET. AL.

SERVICE LIST

**PLEASE SERVE:**

Brixmor SPE 3 LLC
c/o Illinois Corporation Service, Reg. Agent
801 Adlai Stevenson Drive
Springfield, IL  62703-4261

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, for itself and as Assignee of WRIGHT ENTERTAINMENT GROUP, INC., an Illinois corporation, | ) ) ) ) ) | 2017CH07300 CALENDAR/ROOM 15 TIME 00:00 Declaratory Jdgmt |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No.: |
| BRIXMOR SPE 3 LLC, a Delaware limited liability company f/k/a CENTRO BRADLEY SPE 3 LLC, BRIXMOR PROPERTY GROUP, INC., a Maryland corporation, and FEDERAL INSURANCE COMPANY, an Indiana corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff, ACE AMERICAN INSURANCE COMPANY, for itself and as Assignee of

WRIGHT ENTERTAINMENT GROUP ("Wright") by its attorneys, Bryce Downey & Lenkov

LLC, Jeanne M. Hoffmann and Joseph M. Eichberger, and for their Complaint for Declaratory

Judgment and Other Relief against Defendants BRIXMOR PROPERTY GROUP ("Brixmor")

and FEDERAL INSURANCE COMPANY ("Federal"), state as follows:

### FACTS COMMON TO ALL COUNTS

1.     ACE AMERICAN INSURANCE COMPANY ("ACE") is a Pennsylvania

corporation and is in the business of insurance underwriting.

2.     WRIGHT ENTERTAINMENT GROUP, INC. ("Wright") is an Illinois

corporation d/b/a Hollywood Park, Inc., and is a tenant on the premises identified as Rivercrest

Shopping Center, located at or near 13120 Rivercrest Drive, Crestwood, Illinois. H & W RISK

MANAGEMENT ("H & W") is the claims administrator for ACE.

3. ACE insured Wright pursuant to a policy of insurance No. OGL G23977564 with effective dates of October 27, 2011 through October 27, 2012 (the "ACE Policy"). A copy of the ACE Policy is attached hereto as Exhibit 1.

4. ACE brings this action for itself and as Assignee of Wright pursuant to the ACE Policy.

5. On information and belief, BRIXMOR SPE 3 LLC ("Brixmor") is a Delaware limited liability company f/k/a CENTRO BRADLEY SPE 3 LLC, and is in the business of owning and managing commercial and retail properties. On information and belief, BRIXMOR PROPERTY GROUP, INC. is a Maryland corporation and the parent company of Brixmor.

6. FEDERAL INSURANCE COMPANY ("Federal") is an Indiana corporation and is in the business of insurance underwriting.

## BACKGROUND

7. On February 1, 2012, a woman named Chrystine Gomez slipped on snow and ice in the parking lot on her way to work at the Burlington Coat Factory premises. She parked her car in a parking space bordering Wright Entertainment Group's premises and nearby her employer, Burlington Coat Factory's front door.

8. Mrs. Gomez made a claim for workman's compensation and was paid money by her employer's workman's compensation carrier. That workman's compensation carrier sued Dell Corporation and Roy Erikson Outdoor Maintenance, Inc. to recover the money paid to Gomez.

9. The workman's compensation carrier asserted that Dell and Erikson caused the snow and ice condition in the parking lot where Ms. Gomez fell by negligently snowplowing the common area parking lot.

10. The snowplow service hired by Dell provided sworn testimony that they do not plow the area where Ms. Gomez fell, but that Wright hired the snowplow services that did that work.

11.     Thereafter, Dell Corporation filed Third Party Complaints against Wright and Target's snowplow service, Ferrandino & Sons (the "Lawsuit"). A copy of the Lawsuit is attached hereto as Exhibit 2.

12.     Wright entered into a lease agreement with Centro Properties Group. On or about October 5, 2010, the parties executed a Third Amendment to Lease (the "Lease"). A copy of the Lease is attached hereto as Exhibit 3.

13.     On information and belief, a name change occurred whereby Centro Bradley SPE 3 LLC became Brixmor.

14.     Pursuant to the Lease and as part of their rental fee, Wright pays Brixmor for Brixmor's service to snowplow the parking lot and for Brixmor's hire to otherwise maintain the parking lot spaces surrounding Wright's leased property near where the incident involving Ms. Gomez occurred.

15.     Brixmor, as property manager for Wright, conducts snowplow and other common area maintenance services for a fee from Wright. Wright does not hire or do snow plowing of the parking lot surrounding their premises because this is up to Brixmor.

16.     The Lease contains a section, ¶ 9, entitled EASEMENT ENFORCEMENT. In this section Brixmor asserts that it is a party to the Easement of March 25, 1993: "Landlord acknowledges that it is a party to that certain written Easement dated March 25, 1993 as Doc No. 93223679 in the Cook County Recorder of Deeds ("Easement")." See Lease at p.3, ¶9, attached hereto as Exhibit 2. See also the Easement, attached hereto as Exhibit 4.

17.     Article IV of the Easement of March 25, 1993 entitled MAINTENANCE AND REPAIR, paragraph 4.1 entitled Common Area, subparagraph 4.1(ii) reads as follows:

> **Debris and Refuse.** Periodic removal of all papers, debris, filth, refuse, ice and snow (2" on surface), including daily vacuuming and broom sweeping to the extent necessary to keep the Common Area in a first class, clean and orderly condition…"

18.     The terms of the Easement to which Brixmor is a party required Brixmor and/or its insurer to defend and indemnify its tenant, Wright, in the Lawsuit.

19.     On information and belief, Wright is an insured and/or an additional insured under a general liability insurance policy Federal issued to Brixmor.

20.     On or about October 5, 2015, Wright tendered defense and indemnity of the Lawsuit to Brixmor ("Tender Letter"). A copy of the Tender Letter is attached hereto as Exhibit 5.

21.     On information and belief, Brixmor notified and tendered the Lawsuit against Wright to Brixmor's insurance carrier, Federal.

22.     For a period of roughly six months following tender, Wright received no response from Brixmor or Federal to its Tender Letter.

23.     On or about April 7, 2016, Federal, through its third party administrator, Gallagher Bassett Services, responded to Wright's Tender Letter stating that "we will defend and indemnify Wright Entertainment Group Incorporated d/b/a Hollywood Park pursuant to the lease agreement…" (the "Tender Acceptance Letter"). A copy of the Tender Acceptance Letter is attached hereto as Exhibit 6.

24.     Pursuant to the Lease and Easement, Brixmor is obligated to provide insurance and to defend and indemnify Wright in the Lawsuit.

25.     Pursuant to the Lease and Easement, Brixmor is obligated to defend and indemnify Wright for the Lawsuit seeking to hold Brixmor liable for Wright's failure to maintain the leased property.

26.     While Federal sent the Tender Acceptance Letter admitting to its duty to defend and indemnify Wright in connection with the Lawsuit, to date Federal has failed to do so by

failing to reimburse Wright and ACE for the attorneys' fees and costs incurred for Wright's defense of the Lawsuit.

27.     As a direct and proximate result of Federal and Brixmor's failure to defend and indemnify Wright, Wright has suffered damages in excess of $50,000.00.

28.     As a direct and proximate result of Federal's breach of its duty to defend Wright, ACE has suffered damages in the payment of Wright's defense costs which should have been paid by Federal.

## COUNT I

### Breach of Contract/Failure to Provide Insurance

29.     ACE re-alleges and incorporates the allegations contained in Paragraphs 1 through 28 as though fully stated herein.

30.     Pursuant to the Lease and Easement, Brixmor was required to provide insurance for liability for damages as sought from Wright in the Lawsuit.

31.     To date, neither Brixmor nor Federal has fully reimbursed Wright for the amounts expended for Wright's defense of the Lawsuit.  Further, Federal has not filed a declaratory judgment action seeking to determine the insured status of Wright or the coverage available to Wright through Federal.  Instead, and a after a six-month delay, Federal admitted to its duty to defend and indemnify Wright, but then failed to satisfy the defense obligation.

32.     Wright has complied with all its obligations pursuant to the Lease and Easement.

33.     Brixmor has breached its contractual obligations to Wright and to ACE as Assignee of Wright by failing to provide Wright with insurance for the defense and indemnity of Wright in connection with the Lawsuit.

WHEREFORE, Plaintiff, ACE AMERICAN INSURANCE COMPANY prays for a judgment in its favor: (1) finding that Brixmor breached its contractual obligation to provide insurance coverage to Wright for the defense of Wright in connection with the Lawsuit; (2) compensating ACE for damages proximately caused by Brixmor's failure to obtain insurance for the defense and indemnity of Wright in connection with the Lawsuit; and (3) for such other relief as is just.

## COUNT II

### Indemnity

34.     ACE re-alleges and incorporates the allegations contained in Paragraphs 1 through 33 as though fully set forth herein.

35.     Wright has complied with all its obligations pursuant to the Lease and Easement.

36.     Brixmor has breached its contractual obligations to Wright by failing to provide Wright with full defense and indemnity for Wright in connection with the Lawsuit.

WHEREFORE, Plaintiff, ACE AMERICAN INSURANCE COMPANY prays for a judgment in its favor: (1) finding that Brixmor breached its contractual obligations to Wright by failing to fully compensate Wright for its defense and indemnity in connection with the Lawsuit; (2) compensating ACE for damages proximately caused by Brixmor's failure to defend and indemnity Wright in connection with the Lawsuit; and (3) for such other relief as is just.

## COUNT III

### Breach of Duty to Defend

37.     ACE re-alleges and incorporates the allegations contained in Paragraphs 1 through 28 as though fully stated herein.

38.     Under the general liability and/or property insurance policy Federal issued to Brixmor, Federal had a duty to defend and indemnify Wright in connection with the Lawsuit.

39.     Federal breached its duty to defend Wright by failing to provide Wright with a full defense and indemnity for the claims against Wright in the Lawsuit, and by failing to file an action seeking a declaration of its rights under the Federal insurance policy.

40.     Because of Federal's failure to defend Wright and to file an action seeking a declaration as to Wright's coverage under the Federal policy, an actual controversy exists between Federal and Wright and ACE as Assignee of Wright.

WHEREFORE, Plaintiff, ACE AMERICAN INSURANCE COMPANY prays for a judgment against Federal (1) declaring that it has breached its duty to defend Wright against the claims brought against Wright in the Lawsuit; (2) declaring Federal is estopped from raising any policy defenses to the coverage of Wright in connection with the Lawsuit; (3) finding Federal is in bad faith for its failure to defend Wright; (4) for attorneys' fees and costs in connection with this declaratory judgment action establishing coverage; and (5) for such other relief as is just.

## COUNT IV

### Equitable Subrogation

41.     ACE incorporates the allegations contained in Paragraphs 1 through 28 and 37 through 40 as though fully set forth herein.

42.     Federal is primarily liable for Wright's defense and indemnity for the claims asserted in the Lawsuit.

43.     Because of Federal's breach of its duty to defend Wright in the Lawsuit, ACE was required to expend substantial sums in Wright's defense.

44.     By the time of Federal's Tender Acceptance Letter, ACE had already incurred significant sums for attorneys' fees and other costs in defending Wright in the Lawsuit. ACE

was required to expend additional funds on behalf of Wright in seeking reimbursement from Federal.

45.     ACE seeks equitable subrogation from Federal for the expense of defending Wright in the Lawsuit, as well as for any subsequent costs incurred in seeking to obtain this reimbursement from Federal.

WHEREFORE, Plaintiff ACE AMERICAN INSURANCE COMPANY prays for judgment in its favor for (1) money damages from Federal fully reimbursing ACE for all sums expended for attorneys' fees and costs for defense of Wright in the Lawsuit; (2) fully reimbursing ACE for any additional sums incurred by ACE in obtaining the reimbursement it is owed; and (3) for such other relief as is just.

Respectfully Submitted,

WRIGHT ENTERTAINMENT GROUP and
ACE INSURANCE

By:  _____
        One of Their Attorneys

Jeanne M. Hoffmann
Joseph Eichberger
Bryce Downey & Lenkov LLC
200 North LaSalle Street, Suite 2700
Chicago, IL 60601
T: (312) 377-1501
F: (312) 377-1502
Firm I.D. #45609
jhoffmann@bdlfirm.com
jeichberger@bdlfirm.com

{01548474.DOCX / }                                        8



## QUESTIONS ABOUT YOUR INSURANCE?

Answers to questions about your insurance, coverage information, or assistance in resolving complaints can be obtained by contacting:

ACE Customer Support Services Department:
436 Walnut Street
Philadelphia, Pennsylvania 19106-3703

Telephone Number: 1-800-352-4462

The **Illinois Division of Insurance** may also be contacted for assistance. Insurance analysts are available to answer general questions by phone at our toll-free Consumer Assistance Hotline (866) 445-5364. **However, complaints must be submitted in writing.**

**How to file a complaint with the Insurance Department:**

Complaints may be submitted in the following ways:

- On-line at www.ins.state.il.us and by following the instructions posted.
- By fax: (217) 558-2083
- By mail: 320 W. Washington St. Springfield, IL 62767



**EXHIBIT**

*1*

Company Copy

ALL-18653b (06/ 08)



## ACE Producer Compensation
### Practices & Policies

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents. You can obtain that information by accessing our website at http://www.aceproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

ALL-20887 (10/06)

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site — http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

IL P 001 01 04

© ISO Properties, Inc., 2004

Page 1 of 1

# POLICYWRITING INDEX

ACE American Insurance Company

| ACCOUNT ID<br>SWRIG1342 | POLICY NUMBER<br>OGL    G23977564 | PREVIOUS POLICY NUMBER<br>OGL    G23977564 | EFFECTIVE DATE<br>10-27-2011 | EXPIRATION DATE<br>10-27-2012 |
|---|---|---|---|---|

NAMED INSURED    WRIGHT ENTERTAINMENT GROUP

**MISCELLANEOUS INFORMATION**

| BILL TYPE | AGENCY |
|---|---|
| AUDIT INDICATOR | Waived |
| BILL PLAN | OTHER |
| OPERATOR I.D. | ACEPARTNER\KXDYER |
| U/ W I.D. | XDY |
| PROGRAM CODE | |
| SIC CODE | 7993 |
| OFFICE CODE | |
| OFFICE NAME | |
| WORK PHONE # | |
| OTHER PHONE # | |
| NAME OF CONTACT | |

**TRANSACTION INFORMATION**

| TRANS. TYPE | New Business |
|---|---|
| TRANS. SEQ. # | 001 |
| DATE PROCESSED | 11-02-11 |
| TRANS. DATE | 10-27-11 |
| ENDORSEMENT # | |
| CANC/ REIN REASON | |

**LINE OF BUSINESS/ COMMISSIONS:**

| LINE OF BUSINESS | COMMISSION % |
|---|---|
| GENERAL LIABILITY | 21.00 |

| | | |
|---|---|---|
| FULL ANNUAL PREMIUM | $ | 26,495.00 |
| BILLED PREMIUM | $ | 26,495.00 |

**NAMED INSURED MAILING ADDRESS**

WRIGHT ENTERTAINMENT GROUP
INC.  DBA HOLLYWOOD PARK
5051 CAL SAG ROAD

CRESTWOOD                          IL        60445

**AGENT INFORMATION**          CODE    243105

HAAS & WILKERSON INC
4300 SHAWNEE MISSION PARKWAY

FAIRWAY                            KS        66205

**ASSEMBLY INFORMATION**

**MAILING INSTRUCTIONS**

## POLICYWRITING INDEX

| ACCOUNT ID | POLICY NUMBER | PREVIOUS POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|---|---|
| SWR1G1342 | OGL G23977564 | OGL G23977564 | 10-27-2011 | 10-27-2012 |

COMPUTER PRODUCED FORMS

| ALL-18653B | 06-08 | QUESTIONS ABOUT YOUR INSURANCE - IL |
|---|---|---|
| ALL-20887 | 10-06 | ACE PRODUCER COMP PRACTICES & POLICIES |
| IL P 001 | 01-04 | US TREASURY DEPT'S OFAC ADVISORY NOTICE |
| ALL-24624 | 01-08 | COMMON POLICY DECLARATIONS |
| ALL-24990 | 01-08 | INSTALLMENT SCHEDULE |
| ALL-24625 | 01-08 | SCHEDULE OF LOCATIONS |
| ALL-24626 | 01-08 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| CC1K11G | 01-11 | SIGNATURES |
| IL 00 17 | 11-98 | COMMON POLICY CONDITIONS |
| IL 00 21 | 09-08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT |
| IL 01 47 | 09-11 | ILLINOIS CHANGES - CIVIL UNION |
| IL 01 62 | 09-08 | ILLINOIS CHANGES - DEFENSE COSTS |
| ALL-21101 | 11-06 | TRADE OR ECONOMIC SANCTIONS ENDORSE |
| TRIA15C | 01-08 | NOTICE OF TERRORISM INSURANCE COVERAGE |
| LD-24638 | 01-08 | COMM GENERAL LIABILITY COVERAGE SUPP DEC |
| LD-24640IL | 01-08 | LIQUOR LIABILITY COVERAGE PART DEC |
| CG 00 01 | 12-07 | COMMERCIAL GENERAL LIABILITY COV FORM |
| CG 00 33 | 12-07 | LIQUOR LIABILITY COV FORM (OCCURRENCE) |
| CG 00 68 | 05-09 | RECRDG AND DISTRB OF MATRL OR INFO EXCL |
| LD-23516A | 07-08 | CATASTROPHE MNGMT COV ENDT |
| CG 02 00 | 12-07 | IL CHANGES - CANC & NONRENL |
| CG 31 22 | 09-02 | ILLINOIS CHANGES-LIQUOR LIABILITY |
| CG 20 11 | 01-96 | ADDL INSD-MANAGERS/LESSORS OF PREMISES |
| CG 20 26 | 07-04 | ADDL INSD-DESIGNATED PERSON/ORGANIZATION |
| CG 21 35 | 10-01 | EXCL-COV C-MEDICAL PAYMENTS |
| CG 21 44 | 07-98 | LIMIT OF COV TO DESIGNATED PREM OR PROJ |
| CG 21 47 | 12-07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG 21 65 | 12-04 | TOTAL POLLUTION EXCL-WITH EXCEPTIONS |
| CG 21 73 | 01-08 | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| CG 24 12 ADL | 11-85 | BOATS |
| LD-20933 | 10-06 | ADDL INS-CRNIVL VNDRS,CONC,AMSMNT OPTR |
| LD-21943 | 03-07 | FUNGI OR BACTERIA EXCLUSION |
| LD-2Y21A | 07-99 | PERS/ADVRT INJ BROADND COV AMUSE/SPORT |
| LD-3R16 | 03-87 | EXCLUSION - ASBESTOS |
| LD-4S35 | 06-92 | EXCLUSION - LEAD |

**Policy Number**
OGL  G23977564

Reissue Of:
OGL    G23977564

## COMMON POLICY DECLARATIONS
# ACE American Insurance Company
436 Walnut Street , Philadelphia, PA 19106

| Item 1. | Named Insured and Mailing Address | | Agent Name and Address |
|---|---|---|---|

WRIGHT ENTERTAINMENT GROUP
INC. DBA HOLLYWOOD PARK
5051 CAL SAG ROAD
CRESTWOOD IL 60445

HAAS & WILKERSON INC
4300 SHAWNEE MISSION PARKWAY
FAIRWAY KS 66205

Agent No.  243105

| Item 2. | Policy Period | From:  10-27-2011 To:  10-27-2012 |
|---|---|---|

at 12:01 A.M., Standard Time at your mailing address shown above.

| Item 3. | Business Description: |
|---|---|

Form of Business:   CORPORATION

| Item 4. | In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. |
|---|---|

This policy consists of the following coverage parts for which a premium is indicated.  Where no premium is shown, there is no coverage.  This premium may be subject to adjustment.

| Coverage Part(s) | | Premium |
|---|---|---|
| Commercial Property Coverage Part | | NOT COVERED |
| Commercial General Liability Coverage Part | $ | 26,495.00 |
| Crime and Fidelity Coverage Part | | NOT COVERED |
| Commercial Inland Marine Coverage Part | | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | | NOT COVERED |
| Commercial Garage Coverage Part | | NOT COVERED |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Total Policy Premium   $ | 26,495.00 |

| Item 5. | Forms and Endorsements |
|---|---|

| Form(s) and Endorsement(s) made a part of this policy at time of issue: | **BILL TYPE:** Agent Billing |
|---|---|
| **See Schedule of Forms and Endorsements** | **BILL PLAN:** Other |

Countersigned:

Date: _____   By: _____

Authorized Representative

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

ALL-24624 (01/ 08)

Company Copy



**Policy Number**
**OGL  G23977564**

INSTALLMENT SCHEDULE

## ACE American Insurance Company

Named Insured  WRIGHT ENTERTAINMENT GROUP

Effective Date: 10-27-11
12:01 A.M., Standard Time

Agent Name  HAAS & WILKERSON INC

Agent No.  243105

IT IS HEREBY AGREED AND UNDERSTOOD THAT THIS POLICY IS
PAYABLE ON INSTALLMENTS AS FOLLOWS:

|  | DUE | PREMIUM | SURCHARGE | REVISED INSTALLMENT TOTAL |
|---|---|---|---|---|
| DEPOSIT | 10/27/2011 | $      5,299.00 |  | $      5,299.00 |
| INSTALL | 08/27/2012 | $     10,598.00 |  | $     10,598.00 |
| INSTALL | 09/27/2012 | $     10,598.00 |  | $     10,598.00 |

Failure to pay the Installment Premium by the Date Due shown shall constitute non-payment of premium for which we
may cancel this policy.

ALL-24990(01/ 08)

Company Copy



**Policy Number**
**OGL  G23977564**

SCHEDULE OF LOCATIONS

## ACE American Insurance Company

| Named Insured | WRIGHT ENTERTAINMENT GROUP | Effective Date: | 10-27-11 |
|---|---|---|---|
| | | | 12:01 A.M., Standard Time |

Agent Name  HAAS & WILKERSON INC

Agent No.  243105

| Loc. No. | Bldg. No. | Designated Locations (Address, City, State, Zip Code) | Occupancy |
|---|---|---|---|
| 001 | 001 | 5051 CAL SAG ROAD, CRESTWOOD, IL 60445 | |
| 002 | 001 | 2629-35 S BERNICE ROAD, LANSING, IL 60438 | |
| 003 | 001 | 2636 S BERNICE ROAD, LANSING, IL 60438 | |

ALL-24625 (01/ 08)



**Policy Number**
OGL G23977564

SCHEDULE OF FORMS AND ENDORSEMENTS

## ACE American Insurance Company

| | |
|---|---|
| Named Insured   WRIGHT ENTERTAINMENT GROUP | Effective Date:    10-27-11 |
| | 12:01 A.M., Standard Time |

Agent Name  HAAS & WILKERSON INC
Agent No.   243105

COMMON POLICY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| ALL-18653B | 06-08 | QUESTIONS ABOUT YOUR INSURANCE - IL |
| ALL-20887 | 10-06 | ACE PRODUCER COMP PRACTICES & POLICIES |
| IL P 001 | 01-04 | US TREASURY DEPT'S OFAC ADVISORY NOTICE |
| ALL-24624 | 01-08 | COMMON POLICY DECLARATIONS |
| ALL-24990 | 01-08 | INSTALLMENT SCHEDULE |
| ALL-24625 | 01-08 | SCHEDULE OF LOCATIONS |
| ALL-24626 | 01-08 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| CC1K11G | 01-11 | SIGNATURES |
| IL 00 17 | 11-98 | COMMON POLICY CONDITIONS |
| IL 00 21 | 09-08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT |
| IL 01 47 | 09-11 | ILLINOIS CHANGES - CIVIL UNION |
| IL 01 62 | 09-08 | ILLINOIS CHANGES - DEFENSE COSTS |
| ALL-21101 | 11-06 | TRADE OR ECONOMIC SANCTIONS ENDORSE |
| TRIA15C | 01-08 | NOTICE OF TERRORISM INSURANCE COVERAGE |

GENERAL LIABILITY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| LD-24638 | 01-08 | COMM GENERAL LIABILITY COVERAGE SUPP DEC |
| LD-24640IL | 01-08 | LIQUOR LIABILITY COVERAGE PART DEC |
| CG 00 01 | 12-07 | COMMERCIAL GENERAL LIABILITY COV FORM |
| CG 00 33 | 12-07 | LIQUOR LIABILITY COV FORM (OCCURRENCE) |
| CG 00 68 | 05-09 | RECRDG AND DISTRB OF MATRL OR INFO EXCL |
| LD-23516A | 07-08 | CATASTROPHE MNGMT COV ENDT |
| CG 02 00 | 12-07 | IL CHANGES - CANC & NONRENL |
| CG 31 22 | 09-02 | ILLINOIS CHANGES-LIQUOR LIABILITY |
| CG 20 11 | 01-96 | ADDL INSD-MANAGERS/LESSORS OF PREMISES |
| CG 20 26 | 07-04 | ADDL INSD-DESIGNATED PERSON/ORGANIZATION |
| CG 21 35 | 10-01 | EXCL-COV C-MEDICAL PAYMENTS |
| CG 21 44 | 07-98 | LIMIT OF COV TO DESIGNATED PREM OR PROJ |
| CG 21 47 | 12-07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG 21 65 | 12-04 | TOTAL POLLUTION EXCL-WITH EXCEPTIONS |
| CG 21 73 | 01-08 | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| CG 24 12 | 11-85 | BOATS |
| LD-20933 | 10-06 | ADDL INS-CRNIVL VNDRS,CONC,AMSMNT OPTR |
| LD-21943 | 03-07 | FUNGI OR BACTERIA EXCLUSION |
| LD-2Y21A | 07-99 | PERS/ADVRT INJ BROADND COV AMUSE/SPORT |
| LD-3R16 | 03-87 | EXCLUSION - ASBESTOS |
| LD-4S35 | 06-92 | EXCLUSION - LEAD |

ALL-24626 (01/ 08)

Company Copy



## SIGNATURES

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

INDEMNITY INSURANCE COMPANY OF NORTH AMERICA (A stock company)
BANKERS STANDARD FIRE AND MARINE COMPANY (A stock company)
BANKERS STANDARD INSURANCE COMPANY (A stock company)
ACE AMERICAN INSURANCE COMPANY (A stock company)
ACE PROPERTY AND CASUALTY INSURANCE COMPANY (A stock company)
INSURANCE COMPANY OF NORTH AMERICA (A stock company)
PACIFIC EMPLOYERS INSURANCE COMPANY (A stock company)
ACE FIRE UNDERWRITERS INSURANCE COMPANY (A stock company)
WESTCHESTER FIRE INSURANCE COMPANY (A stock company)

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

CARMINE A. GIGANTI, Secretary

JOHN J. LUPICA, President

_____
Authorized Representative

CC-1K11g (01/11)

Company Copy

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98     Copyright, Insurance Services Office, Inc., 1998     Page 1 of 1 ☐

Company Copy

IL 00 21 09 08

~~THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.~~

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

    A. Under any Liability Coverage, to "bodily injury" or "property damage":

    (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

    (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

    (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

    (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties.

    "Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

Company Copy

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

  (a) Any "nuclear reactor";

  (b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

  (c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

  (d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007

IL 00 21 09 08

Company Copy

IL 01 47 09 11

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES – CIVIL UNION

This endorsement modifies insurance provided under the following:

    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
    FARM COVERAGE PART
    FARM UMBRELLA LIABILITY POLICY
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCT WITHDRAWAL COVERAGE PART
    PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

A. The term "spouse" is replaced by the following:

Spouse or party to a civil union recognized under Illinois law.

B. Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

1. Individual Named Insured by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of such Named Insured's household, including a ward or foster child; or

2. Individual named in the Schedule by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage — Broadened Coverage For Named Individual Endorsement is attached.

C. With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or civil union recognized under Illinois law, who is a resident of your household, including a ward or foster child.

Company Copy

IL 01 62 09 08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES – DEFENSE COSTS

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART – LEGAL LIABILITY COVERAGE FORM
COMMERCIAL PROPERTY COVERAGE PART – MORTGAGEHOLDERS ERRORS AND OMISSIONS
COVERAGE FORM
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK COVERAGE PART

**A.** The provisions of Paragraph **B.** are added to all Insuring Agreements that set forth a duty to defend under:

1. Section **I** of the Commercial General Liability, Commercial Liability Umbrella, Employment-Related Practices Liability, Farm, Liquor Liability, Owners And Contractors Protective Liability, Pollution Liability, Products/ Completed Operations Liability, Product Withdrawal, Medical Professional Liability, Railroad Protective Liability, Underground Storage Tank Coverage Parts and the Farm Umbrella Liability Policy;

2. Section **II** – Liability Coverage in Paragraph **A.** Coverage under the Business Auto, Garage, Motor Carrier and Truckers Coverage Forms;

3. Section **A.** Coverage under the Legal Liability Coverage Form; and

4. Coverage **C** – Mortgageholder's Liability under the Mortgageholders Errors And Omissions Coverage Form.

**B.** If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

© ISO Properties, Inc., 2007

Company Copy

POLICY NUMBER: OGL     G23977564

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

Authorized Agent

ALL-21101 (11/06) Ptd. in U.S.A.                                                    Page 1 of 1

Company Copy

ACE  American  Insurance  Company
Insurance Company

WRIGHT  ENTERTAINMENT  GROUP
Policyholder

OGL    G23977564
Policy Number

HAAS  &  WILKERSON  INC
Broker/ Producer

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under the Terrorism Risk Insurance Act, as amended, that you have the right to purchase insurance coverage for losses resulting from acts of terrorism, *as defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in concurrence with the Secretary of State, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, SUCH POLICIES MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS- LIABIITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, COVERAGE MAY BE REDUCED.

You elected *NOT* to purchase terrorism coverage under the Act at the price indicated. ACCORDINGLY, WE WILL *NOT* PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of <u>$530</u>, however you elected to decline such coverage.

TRIA15c (01/ 08)



| | Policy Number |
|---|---|
| | OGL  G23977564 |

Commercial General Liability Coverage Part
Supplemental Declarations

# ACE American Insurance Company

Named Insured   WRIGHT ENTERTAINMENT GROUP

Effective Date: 10-27-2011
12:01 A.M. Standard Time

Agent Name      HAAS & WILKERSON INC
Agent No.       243105

**Item 1.   Business Description:**

**Item 2. Limits of Insurance**

| Coverage | Limit of Liability | |
|---|---|---|
| Aggregate Limits of Liability | $      5,000,000 | Products/ Completed Operations Aggregate |
| | $      5,000,000 | General Aggregate (other than Products/ Completed Operations) |
| Coverage A -- Bodily Injury and Property Damage Liability | $      1,000,000 | any one occurrence subject to the Products/ Completed Operations and General Aggregate Limits of Liability |
| Damage To Premises Rented To You | $        100,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B - Personal and Advertising Injury Liability | $      1,000,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C -- Medical Payments | NOT COVERED | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 3. Retroactive Date  (Not Applicable in New York)**

This Insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which occurs before the Retroactive Date, if any, shown here:

(Enter Date or "None" if no Retroactive Date applies)

**Item 4. Form of Business and Location of Premises**

Forms of Business:  CORPORATION
Location of All Premises You Own, Rent or Occupy:
   **See Schedule of Location**

**Item 5. Form and Endorsements**

Form(s) and Endorsement(s) made a part of this policy at time of issue:
   **See Schedule of Forms and Endorsements**

**Item 6.   Premiums**

| | | |
|---|---|---|
| Coverage Part Premium: | $ | 26,495.00 |
| Other Premium: | | |
| Total Premium: | $ | 26,495.00 |

| Audit Period (If Applicable) | X | Waived | Annually | Semi-Annually | Quarterly | Monthly |
|---|---|---|---|---|---|---|

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD

LD-24638 (01/ 08)

Company Copy



Policy Number

**OGL G23977564**

## LIQUOR LIABILITY COVERAGE PART DECLARATIONS

### ACE American Insurance Company

| Named Insured | WRIGHT ENTERTAINMENT GROUP | Effective Date: 10-27-11 |
|---|---|---|
| | | 12:01 A.M. Standard Time |
| Agent Name | HAAS & WILKERSON INC | |
| Agent No. | 243105 | |

| **Item 1.** Limits of Insurance | |
|---|---|
| Aggregate Limit | $ 1,000,000 |
| Each Common Cause Limit | (see endorsement CG 31 22) |

**Item 2.** Retroactive Date (CG 00 34 only)      (Not Applicable in New York)

Section I of this insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which occurs before the Retroactive Date, if any, shown here:

(Enter Date or "None" if no Retroactive Date applies)

**Item 3.** Business Description and Location of Premises

Forms of Business:

CORPORATION

Business Description:

Location of All Premises You Own, Rent Or Occupy:
**See Schedule of Locations**

**Item 4.** Premium

| Code No. | Premium Basis | Premises/ Operations | |
|---|---|---|---|
| Location | Exposure | Rate | Premium |
| Classification: | | Products/ Completed Operations | |
| **See Commercial General Liability Coverage Schedule** | | Rate | Premium |

**Item 5.** Schedule of Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

LD-24640-IL (01/ 08)

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 00 01 12 07

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V — Definitions.

## SECTION I — COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

Company Copy

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2006

CG 00 01 12 07

Company Copy

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

© ISO Properties, Inc., 2006

Company Copy

(2) Any loss, cost or expense arising out of any:

  (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

  (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

  (a) Less than 26 feet long; and

  (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

  (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

  (b) the operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. **War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. **Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2006

CG 00 01 12 07

Company Copy

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

CG 00 01 12 07 © ISO Properties, Inc., 2006 Page 5 of 16

Company Copy

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III — Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages **A** and **B.**

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g. **Quality Or Performance Of Goods — Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

© ISO Properties, Inc., 2006

Company Copy

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

 © ISO Properties, Inc., 2006

Company Copy

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

© ISO Properties, Inc., 2006

CG 00 01 12 07

Company Copy

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** -- Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   (1) "Bodily injury" or "personal and advertising injury":

      (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

      (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

      (d) Arising out of his or her providing or failing to provide professional health care services.

   (2) "Property damage" to property:

      (a) Owned, occupied or used by,

      (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

      you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

 © ISO Properties, Inc., 2006

Company Copy

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III — LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS

1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

Company Copy

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and.

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I — Coverage A — Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

(2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

© ISO Properties, Inc., 2006

Company Copy

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    (a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    (b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2006

CG 00 01 12 07

Company Copy

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

© ISO Properties, Inc., 2006

Company Copy

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

       (1) Power cranes, shovels, loaders, diggers or drills; or

       (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

       (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

       (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    (1) Equipment designed primarily for:

       (a) Snow removal;

       (b) Road maintenance, but not construction or resurfacing; or

       (c) Street cleaning;

    (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f. The use of another's advertising idea in your "advertisement"; or

    g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

© ISO Properties, Inc., 2006

CG 00 01 12 07

Company Copy

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

CG 00 01 12 07 © ISO Properties, Inc., 2006 Page 15 of 16

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2006

CG 00 01 12 07

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 00 33 12 07

# LIQUOR LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – LIQUOR LIABILITY COVERAGE

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "injury" to which this insurance applies if liability for such "injury" is imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "injury" to which this insurance does not apply. We may, at our discretion, investigate any "injury" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

b. This insurance applies to "injury" only if:

(1) The "injury" occurs during the policy period in the "coverage territory"; and

(2) Prior to the policy period, no insured listed under Paragraph 1. of Section II -- Who Is An Insured and no "employee" authorized by you to give or receive notice of an "injury" or claim, knew that the "injury" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "injury" occurred, then any continuation, change or resumption of such "injury" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Injury" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim, includes any continuation, change or resumption of that "injury" after the end of the policy period.

d. "Injury" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim:

(1) Reports all, or any part, of the "injury" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "injury"; or

(3) Becomes aware by any other means that "injury" has occurred or has begun to occur.

### 2. Exclusions

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Injury" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

© ISO Properties, Inc., 2006

Company Copy

c. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the "injury".

d. **Liquor License Not In Effect**

"Injury" arising out of any alcoholic beverage sold, served or furnished while any required license is not in effect.

e. **Your Product**

"Injury" arising out of "your product". This exclusion does not apply to "injury" for which the insured or the insured's indemnities may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

f. **Other Insurance**

Any "injury" with respect to which other insurance is afforded, or would be afforded but for the exhaustion of the limits of insurance.

This exclusion does not apply if the other insurance responds to liability for "injury" imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage.

g. **War**

"Injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**SUPPLEMENTARY PAYMENTS**

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

2. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

3. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

4. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

5. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

6. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

7. Expenses incurred by the insured for first aid administered to others at the time of an event to which this insurance applies.

These payments will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

© ISO Properties, Inc., 2006

CG 00 33 12 07

Company Copy

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph (a) above; or

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (a) or (b) above.

(2) "Property damage" to property:

(a) Owned or occupied by, or

(b) Rented or loaned

to that "employee", any of your other "employees", by any of your partners or members (if you are a partnership or joint venture), or by any of your members (if you are a limited liability company).

b. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

b. Coverage does not apply to "injury" that occurred before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for all "injury" as the result of the selling, serving or furnishing of alcoholic beverages.

3. Subject to the Aggregate Limit, the Each Common Cause Limit is the most we will pay for all "injury" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – LIQUOR LIABILITY CONDITIONS

1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

© ISO Properties, Inc., 2006

Company Copy

2. **Duties In The Event Of Injury, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "injury" which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "injury" took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any "injury".

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury" to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary. Our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

   b. **Method Of Sharing**

      If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

      If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**

   a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

   b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

© ISO Properties, Inc., 2006

CG 00 33 12 07

Company Copy

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

2. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the "injury" occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

c. All other parts of the world if the "injury" arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph **a.** above; or

(2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

3. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

4. "Executive Officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

5. "Injury" means damages because of "bodily injury" and "property damage", including damages for care, loss of services or loss of support.

6. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

7. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

8. "Suit" means a civil proceeding in which damages because of "injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

9. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

 © ISO Properties, Inc., 2006

Company Copy

10. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    (a) You;

    (b) Others trading under your name; or

    (c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product", and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

© ISO Properties, Inc., 2006

CG 00 33 12 07

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 00 68 05 09

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion q. of Paragraph 2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

2. Exclusions

This insurance does not apply to:

q. Recording And Distribution Of Material Or Information In Violation Of Law

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

B. Exclusion p. of Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability is replaced by the following:

2. Exclusions

This insurance does not apply to:

p. Recording And Distribution Of Material Or Information In Violation Of Law

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Company Copy

POLICY NUMBER: OGL    G23977564

## CATASTROPHE MANAGEMENT COVERAGE ENDORSEMENT

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies all insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

### PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART

SECTION I., COVERAGES, is amended to include the following:

Catastrophe Management Costs Limit of Insurance

$250,000 Each Catastrophe Management Event and in the Aggregate for all Catastrophe Management Events Combined.

Catastrophe Management Coverage

A. Subject to the terms and conditions of this endorsement, we will pay "catastrophe management costs" to third parties at the request of and on behalf of the "insured," arising from a "catastrophe management event" first commencing during the "policy period," up to the amount of the "catastrophe management costs" Limit of Insurance shown above.

B. A "catastrophe management event" will be deemed to first commence at the time during the "policy period" when a "key executive" first becomes aware of an "occurrence" that gives rise to the "catastrophe management event" and will end when we determine that any one of the necessary elements listed in the definition of a "catastrophe management event" no longer exists or when the "catastrophe management cost" Limit of Insurance shown above has been exhausted, whichever occurs first.

C. There will be no "retained limit" applicable to "catastrophe management costs", except as it applies to a determination of whether the definition of "catastrophe management event" applies.

D. Payment of "catastrophe management costs" will not be applied to or erode the aggregate limits of the policy. The Single Each Catastrophe Management Event and Aggregate Limit stated above in this endorsement is the most we will pay in any policy period, irrespective of the number of Catastrophe Management Events that may occur.

E. Any payment of "catastrophe management costs" that we make under the coverage provided by this endorsement will not (1) be a determination of any other rights or obligations under this policy, (2) create any duty to defend any "suit" under any other part of this policy, or (3) operate as a waiver of any right or defense we have with respect to the coverage under the policy, including Condition 2. (Duties in the event of "occurrence" claim or "suit.").

Company Copy

F. For purposes of this endorsement, the following definitions are added to the policy:

"Adverse media coverage" means national or regional news exposure in television, radio, print or internet media that is reasonably likely to have a negative impact on the "insured" with respect to its income, reputation, community relations, public confidence or good will.

"Catastrophe management event" means an "occurrence" that, in the good faith opinion of a "key executive" of the Named Insured, has resulted in or is reasonably likely to result in: (1) "bodily injury", "property damage" or "personal and advertising injury" covered by this policy and (2) a need for "catastrophe management services" due to "adverse media coverage". "Catastrophe management event" will include "occurrences" resulting from: explosions and other man-made disasters; serious accidents resulting in multiple deaths, burns, dismemberment injuries; traumatic brain injuries; permanent paralysis injuries; or injuries from contamination of food, drink or pharmaceuticals.

"Catastrophe management firm" means any firm that is approved by us and hired by you or us to perform "catastrophe management services" in connection with a "catastrophe management event."

"Catastrophe management services" means those services performed by a "catastrophe management firm" in advising the "insured" on minimizing potential harm to the "insured" from a covered "catastrophe management event" by managing "adverse media coverage" and maintaining and restoring public confidence in the "insured."

"Catastrophe management costs" means the following reasonable and necessary expenses incurred during a "catastrophe management event" and directly caused by the "catastrophe management event," but only to the extent that the insured or a third party arranges for such services resulting in these expenses and the expenses are pre-approved by us:

1. expenses incurred by a "catastrophe management firm" in the performance of "catastrophe management services" for the "insured";

2. expenses for printing, advertising, mailing of materials or travel by directors, officers, employees or agents of the "insured" or the "catastrophe management firm" incurred at the direction of a "catastrophe management firm"; expenses to secure the scene of a "catastrophe management event;"

3. medical expenses; funeral expenses; expenses for psychological counseling; travel expenses; temporary living expenses or other necessary response costs and approved by us, incurred by or advanced to third parties directly harmed by the "catastrophe management event."

"Catastrophe management costs" do not include any defense costs.

"Key executive" means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel or general partner (if the "insured" is a partnership) or sole proprietor (if the "insured" is a sole proprietorship) of the "insured". A "key executive" also means any other person holding a title designated by you, approved by us, and shown by endorsement to this policy.

All other terms and conditions of this policy remain unchanged.

Authorized Agent

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 02 00 12 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART

**A. Cancellation** (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. We may cancel this policy by mailing to you written notice stating the reason for cancellation. If we cancel:

   a. For nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   b. For a reason other than nonpayment of premium, we will mail the notice at least:

      (1) 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      (2) 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The policy was obtained through a material misrepresentation;

   c. Any insured has violated any of the terms and conditions of the policy;

   d. The risk originally accepted has measurably increased;

   e. Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   f. A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

If we decide not to renew or continue this policy, we will mail you and your agent or broker written notice, stating the reason for nonrenewal, at least 60 days before the end of the policy period. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

**C. Mailing Of Notices**

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

CG 02 00 12 07  © ISO Properties, Inc., 2006  Page 1 of 1

Company Copy

POLICY NUMBER: OGL    G23977564

COMMERCIAL GENERAL LIABILITY
CG 31 22 09 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES – LIQUOR LIABILITY

This endorsement modifies insurance provided under the following:

LIQUOR LIABILITY COVERAGE FORM

### SCHEDULE

| | Limits Of Insurance |
|---|---|
| Each Person Bodily Injury Limit | $ 61,151.39 |
| Each Person Property Damage Limit | $ 61,151.39 |
| Loss Of Means Of Support Or Loss Of Society Limit | $ 74,740.59 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to Illinois locations:

A. The Each Common Cause Limit shown in the Declaration is replaced by the limits shown in the Schedule above. The Aggregate Limit shown in the Declaration continues to apply.

B. Paragraph 3. of Section III – Limits Of Insurance is replaced by the following:

3. Subject to the Aggregate Limit, the Loss Of Means Of Support Or Loss Of Society Limit is the most we will pay for all loss of means of support or society claimed by one or more persons because of "bodily injury" sustained by any one provider of such support or society as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

C. The following paragraphs are added to Section III – Limits Of Insurance:

4. Subject to the Aggregate Limit, the Each Person Bodily Injury Limit is the most we will pay for all "bodily injury" sustained by one person as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

5. Subject to the Aggregate Limit, the Each Person Property Damage Limit is the most we will pay for all "property damage" sustained by one person or organization as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

D. Conformity To Statute

If the limitation provided under Section 235.5/ 6-21 as published in the Illinois Administrative Code is raised during the policy period, the limits of insurance provided in the Schedule of this endorsement are hereby amended to conform to that statute.

CG 31 22 09 02     © ISO Properties, Inc., 2002     Page 1 of 1

Company Copy

POLICY NUMBER: OGL   G23977564

COMMERCIAL GENERAL LIABILITY
CG 20 11 01 96

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

1. Designation of Premises (Part Leased to You):

   **SEE CG-2144**

2. Name of Person or Organization (Additional Insured):

   **THE OWNER, LESSOR, OR MANAGER OF THE DESIGNATED PREMISES**

3. Additional Premium: **Incl.**

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

CG 20 11 01 96              Copyright, Insurance Services Office, Inc., 1994            Page 1 of 1 ☐

POLICY NUMBER: OGL    G23977564                    COMMERCIAL GENERAL LIABILITY
                                                          CG 20 26 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) |
|---|
| Centro Properties Group and Centro Bradley SPE 3 LLC c/o EPIX BOP PO Box 257 Ref 60-215168 Portland, MI 48875 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

A. In the performance of your ongoing operations; or

B. In connection with your premises owned by or rented to you.

CG 20 26 07 04             © ISO Properties, Inc., 2004                Page 1 of 1     ☐

Company Copy

POLICY NUMBER: OGL  G23977564

COMMERCIAL GENERAL LIABILITY
CG 21 35 10 01

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - COVERAGE C - MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Description And Location Of Premises Or Classification: |
|---|
| ALL PREMISES AND CLASSIFICATIONS |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

1. Section I - Coverage C - Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

2. The following is added to Section I - Supplementary Payments:

   h. Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

© ISO Properties, Inc., 2000
Company Copy

□

POLICY NUMBER: OGL   G23977564

COMMERCIAL GENERAL LIABILITY
CG 21 44 07 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

Premises:

5051 Cal Sag Road   Crestwood IL 60445
2629-35 S Bernice Road   Lansing IL 60438
2636 S. Bernice Road Lansing IL 60438

Project:

Fun Center and Vacant Land

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and medical expenses arising out of:

1.  The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

2.  The project shown in the Schedule.

CG 21 44 07 98

Copyright, Insurance Services Office, Inc., 1997

Page 1 of 1

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.,** Exclusions of Section I — Coverage A — Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.,** Exclusions of Section I — Coverage B — Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2. Exclusions of Section I — Coverage A — Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

f. Pollution

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Company Copy

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Company Copy

POLICY NUMBER: OGL    G23977564                    COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BOATS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**Description of Watercraft:**

BUMPER BOATS, FLUME RIDES, AMUSEMENT PARK WHITE WATER
RAFTS; AND PERSONAL WATERCRAFT LIMITED TO PEDAL BOATS,
CANOES, RAFTS, AND KAYAKS THAT ARE OPERATED IN CONJUNCTION
WITH A CARNIVAL RIDE OR AMUSEMENT PARK YOU OWN OR OPERATE.

**Additional Premium:**

Incl.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

1. Exclusion g. of COVERAGE A (Section I) does not apply to any watercraft owned or used by or rented to the insured shown in the Schedule.

2. WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization legally responsible for the use of any such watercraft you own, provided the actual use is with your permission.

CG 24 12 11 85        Copyright, Insurance Services Office, Inc., 1984, 1992        Page 1 of 1        ☐

Company Copy

POLICY NUMBER: OGL    G23977564

# ADDITIONAL INSURED
## CARNIVAL VENDORS, CONCESSIONAIRES AND AMUSEMENT OPERATORS

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### This endorsement modifies all insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A.  WHO IS AN INSURED (Section II) is amended to include the following as insureds:

1. Amusement attraction operators;
2. Amusement ride operators;
3. Concessionaires: and
4. Game operators;

but only with respect to their liability while operating with your permission on the premises of an amusement park or carnival you own or operate.

B.  With respect to this endorsement, Paragraph 4, of **SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS** is deleted and replaced by:

4.  Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Form, this insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance is written specifically to apply in excess of the Limits of Insurance shown in the Declarations of this policy.

When this insurance is excess, we will have no duty under Coverages A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

1. the total amount that all such other insurance would pay for the loss in the absence of this insurance; and,

2. the total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that was not bought specifically to apply in excess of the Limits of Insurance show in the Declarations of this policy.

**Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of all insurers.

Authorized Agent

POLICY NUMBER: OGL    G23977564

# FUNGI OR BACTERIA EXCLUSION

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### This endorsement modifies all insurance provided under the following:

#### COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2. Exclusions of Section I — Coverage A — Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to:

(1) any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption; or

(2) any "fungi" or bacteria on or in an aquatic, recreational attraction.

B. The following exclusion is added to Paragraph 2. Exclusions of Section I — Coverage B — Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

a. "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

Authorized Agent

POLICY NUMBER: OGL    G23977564

**PERSONAL AND ADVERTISING INJURY - BROADENED COVERAGE FOR AMUSEMENT AND SPORTS PROGRAMS ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

1. The following is added to definition 14., "Personal and Advertising Injury" in **SECTION V - DEFINITONS**:

    h. "Discrimination" that results in injury to a natural person due to refusal of:

       (1) Admission or entry to an amusement park, attraction, carnival, fair, festival, rodeo or sporting event; or

       (2) Permission to participate in an activity or attraction at an amusement park, carnival, fair, festival, rodeo or sporting event.

    Paragraph h. of definition 14., "Personal and Advertising Injury" in **SECTION V - DEFINITIONS** does not apply to any claim where insurance for "discrimination" would violate the public policy of the state where the "discrimination" takes place.

2. The following definition is added to **SECTION V - DEFINITIONS**:

    22. "Discrimination" is limited to the difference in treatment of a natural person based on that person's mental or physical limitations. "Discrimination" does not include the difference in treatment of a natural person based on that person's race, color, religion, gender or national origin.

3. For the purposes of this endorsement only, the following additional exclusion applies:

    This insurance does not apply to:

    Class action claims or "suits" arising out of actual or alleged "discrimination," including claims or "suits" alleging that the insured has engaged in "discrimination" against a class of persons whose individual claims are alleged to:

       (a) Be similar to those of each other, and

       (b) Arise out of a common nucleus of operative facts.

4. As respects insurance provided by this endorsement, the Personal and Advertising Injury Limit is amended to read as follows:

    Personal and Advertising Injury Limit    $100,000.

All other terms and conditions of this policy apply.

_____
Authorized Agent

LD-2Y21a (7/99) Printed in U.S.A.

POLICY NUMBER: OGL   G23977564

## EXCLUSION -- ASBESTOS

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
FARM COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVEAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
SPECIAL PROTECTIVE AND HIGHWAY LIABILTIY POLICY – NEW YORK

This insurance does not apply to any loss, demand, claim or "suit" arising out of or related in any way to asbestos or asbestos-containing materials.

Authorized Agent

LD-3R16 (Ed. 3/ 87)  Printed in U.S.A.  Reprinted in part with permission of Insurance Services Office, Inc., 1985

Company Copy

POLICY NUMBER: OGL    G23977564

## EXCLUSION – LEAD

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement amends all insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY FORM**
**FARM COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**
**PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE FORM**
**RAILROAD PROTECTIVE LIABILITY COVERAGE FORM**
**SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK**

**THE COMBINED POLICY – SECTION II**
**COMMERCIAL FARM POLICY – SECTION II**
**FARMERS PACKAGE POLICY – SECTION II**

This insurance does not apply to, and we shall have no duty of any kind with respect to, any injury, damage, expense, cost, loss, liability or legal obligation arising out of or allegedly arising out of or in any way related to the toxic properties of lead or lead-containing products, materials or substances.

This exclusion applies to all forms of lead, including but not limited to solid, liquid, vapor and fumes.

This exclusion applies, but is not limited, to any injury, damage, expense, cost, loss, liability or legal obligation to test for, monitor, abate, remove, or take any other remedial action with respect to lead or lead-containing products, materials or substances.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not also exclude coverage for lead-related injury, damage, expense, cost, loss, liability or legal obligation.

_____
Authorized Agent

LD-4S35 (Ed. 6/92) Ptd. in U.S.A.

GEN. LIAB. - SIMPLIFIED

```
NAMED INSURED: WRIGHT ENTERTAINMENT GROUP        ACE American Insurance Company                   DATE        : 11/02/11
SPECIAL NOTES: GL                                436 Walnut Street                                TRANS TYPE: NEW BUSINESS
INSURANCE CO : ACE American Insurance Co         Philadelphia, PA 19106
BUSINESS TYPE: Corporation

POLICY NUMBER: OGL   G23977564                   AGY/PROD NUMBER: 243105                           AUD FREQ: WAIVED
CUSTOMER ID  : SWRIG1342                         PROD NAME      : HAAS & WILKERSON INC             OPERATOR: ACEPARTNER
SYSTEM ASSIGN: 30837000000000

LOB: GENERAL LIABILITY                EFFECTIVE DATE: 10/27/11        EXPIRE DATE: 10/27/12         ANNIV. DATE:
LOB(GL)SYS RATING VERS: 61.200                                       RATING TIER:


POLICY INFORMATION:                   PRD STATE : IL                 POL. TERM  : 365 DAYS
                                      MUL/STATE : NO                 PKG PROGRAM:


* * * * POLICY PREMIUM TOTALS * * * *
COVERAGES                          PREMIUM
PREMISES OPERATIONS                25,620.00
LIQUOR LAW LIABILITY                  625.00
FREEFORM                              250.00

GRAND TOTAL POLICY PREMIUM          26,495.00

EXPERIENCE RATING - PREMISES MANUAL PREMIUM :    26,245.00
```

```
                          GEN. LIAB. - SIMPLIFIED                              PAGE: 1
                  NAMED INSURED: WRIGHT ENTERTAINMENT GROUP
                  CUSTOMER ID  : SWRIG1342
                  POLICY NUMBER: OGL   G23977564
                  TRANS TYPE   : NEW BUSINESS   EFFECTIVE: 102711
                  TRANS SEQ    : 001

                      GENL LIAB POLICY LEVEL INFORMATION

PKG PROGRAM    :      PKG DESC      :
                      AUDIT FREQ    : WAIVED        DEPOSIT %     :
                      POLICY TYPE   : OCCURRENCE    RETRO DATE    :           CLMS YR  :
                      RETRO RATED   : NO

                      GENERAL AGGR  : 5,000,000     PROD/COMPL AGGR: 5,000,000
                      PER/ADV INJ   : 1,000,000     EACH OCCURRENCE: 1,000,000
                      FIRE DAMAGE   : 100,000       MEDICAL EXPENSE:       N/A
                      COMBINED PREM :

                      PREM/OPS EXPER:  26,245.00    PRODUCTS EXPER :


                      DED SUBLINE      :            DED APPLY        :
                      DED AMOUNT       :            DED TYPE         :
                      PREM/OPS DED FCT :            PRODUCTS DED FCT :
                      DED/RETENTION AGG : NO
                      RISK RETENTION TYPE:          RISK RETENTION SUBLINE :
                      RISK RET AMOUNT    :          RISK RET AGGREGATE     :
                      RISK RET OPTION    :

                      PREM ILF 1   :               PREM ILF 2    :        PREM ILF 3:
                      PROD ILF A   :               PROD ILF B    :        PROD ILF C:
                      SIR TYPE     :               SIR AGG LMT   :        SIR OCC LMT:
                                                   TERR RT GRP   :
```

```
                                                                                          PAGE: 2
                                              NAMED INSURED: WRIGHT ENTERTAINMENT GROUP
                                              CUSTOMER ID  : SWRIG1342
                                              POLICY NUMBER: OGL - G23977564
                                              TRANS TYPE   : NEW BUSINESS   EFFECTIVE: 102711
                                              TRANS SEQ    : 001
```

POLICY FREEFORM INFORMATION

**** POLICY FREEFORM COVERAGE INFORMATION ****

```
CLASS CODE         : 44444
CLASS DESCRIPTION  : PERSONAL & ADV. INJURY-BROADENED COV
GL SUBLINE CODE    : 334
PREMIUM            : 250.00        SURCHARGE APPLY   : Y        SURCHARGE PREMIUM  :

EXPOSURE           :              EXPOSURE INDICATOR :
OCCURRENCE LIMIT   : 100000        AGGREGATE LIMIT   :
DEDUCTIBLE TYPE    :              DEDUCTIBLE AMT     :
RATE DEP FTR       :              RMF               :
FULLY EARNED       :              FLAT CHARGE       : Y        TERM FACTOR       :
```

**** POLICY FREEFORM RATING FORMULAS ****

```
PERSONAL & ADV. INJU   BASE PREMIUM   =
CLASS 44444                250.00                                                      FINAL PREM
                                                                                         250.00
```

```
                                        NAMED INSURED: WRIGHT ENTERTAINMENT GROUP    PAGE:  3
                                        CUSTOMER ID  : SWRIG1342
                                        POLICY NUMBER: OGI  G23977564
                                        TRANS TYPE   : NEW BUSINESS   EFFECTIVE: 102711
                                        TRANS SEQ    : 001
```

————————————————— GENL LIAB CLASS CODE/LOCATION INFORMATION—————————————————

GEN. LIAB. - SIMPLIFIED LOC # 001/BLDG # 001/CLASS 10020 INFO

```
LOC # : 001   BLDG # : 001
5051 CAL SAG ROAD                             TERR STATE: IL
CRESTWOOD,IL 60445                            TERR RATE : 507
                                              TAX DIST  : 4184

CLASS CODE : 10020
CLASS ID   : 000                              DESC : FUN CENTER

PKG PROGRAM :              PKG DESC :
PROD WTHDRW LIAB : NO                          RATE REV DATE: 09/01/11    DEV REV DATE: 06/01/11
PROD EXCLUD : YES                              PREM/OPS EXCLUD : NO
PREM/OPS DED                                   DED APPLIES  : NO
TYPE AMOUNT:                                   PRODUCTS DED
                                              TYPE AMOUNT:
INCREASE LIMITS TABLES
PREM/OPS    : 2                               PREM/OPS EXPER MAN PREM : 25,620.00
PRODUCTS    : B                               PRODUCTS EXPER MAN PREM :


PREM/OPS (A) RATES : YES
PRODUCTS (A) RATES : YES
NEW EXPOSURE       :
DEPOSIT PREM       : NO                        INTERCOMPANY SALES EXPOS :
CLASS EXCLUS:                                  AUDITABLE PRO-RATED EXPOS:
CLASS EXTEN :
STOP GAP    :
STOP GAP AGG:                                  OCC:

PREMOPS BASE OVERRIDE: 25620                   PRODUCTS BASE OVERRIDE   :
```

————————————————— GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT—————————————————

```
RMF            PKG MOD * PKG DEV * EXPER MOD * SCHED MOD *( COMP EXPNS + AGNT EXPNS - CONST )* OTHER MOD *
               1.0000    1.0000    1.0000      1.0000       1.0000       1.0000       1       1.0000
               TOT DEREG MOD =
                   1.000                                                                          RATE MOD
                                                                                                   1.0000
```

————————————————— CLASS CODE/LOCATION GENL LIAB RATING FORMULAS—————————————————

CLASS CODE : 10020          DESC : FUN CENTER

```
PREM/OPS          BASE RATE =
                  25620.000                                                        FINAL PREM
                  ADDL FACTORS:   LOSS COST ADJ FCT 1.000                          25620.00
                  OPERATOR ENTERED OR OVERRODE THE BASE RATE.
```

Company Copy

```
                                                                    PAGE: 4
                                    NAMED INSURED: WRIGHT ENTERTAINMENT GROUP
                                    CUSTOMER ID  : SWRIG1342
                                    POLICY NUMBER: CGL    G23977564
                                    TRANS TYPE   : NEW BUSINESS   EFFECTIVE:  102711
                                    TRANS SEQ    : 001
```

────────────────GENL LIAB CLASS CODE/LOCATION INFORMATION────────────────

GEN. LIAB. - SIMPLIFIED LOC # 001/BLDG # 001/CLASS 70412 INFO

```
CLASS CODE : 70412
CLASS ID   : 000                          DESC : LIQUOR
CLASS STATE: IL
TERR RATE  : 507
TAX DIST   : 5229


PKG PROGRAM :              PKG DESC  :       RATE REV DATE: 09/01/11      DEV REV DATE: 06/01/11
PROD WTHDRW LIAB : NO                        PREM/OPS EXCLUD : NO
PROD EXCLUD  : NO                            DED APPLIES  : NO
PREM/OPS DED                                 PRODUCTS DED
TYPE AMOUNT:                                 TYPE AMOUNT:

INCREASE LIMITS TABLES
PREM/OPS      :                              PREM/OPS EXPER MAN PREM : 625.00
PRODUCTS      :                              PRODUCTS EXPER MAN PREM :

LIQUOR LIABILITY LIMITS
PER PERSON : 61,151.39     LOSS OF SUPPORT : 74,740.59    AGGREGATE        : 1,000,000
PUBLIC ALLOWED : N         LIQUOR DED AMT  :              NO. MEMBERS      :

LIQ LIAB (A) RATES : YES
PRODUCTS (A) RATES : NO
NEW EXPOSURE      :                          INTERCOMPANY SALES EXPOS :
DEPOSIT PREM      : NO                        AUDITABLE PRO-RATED EXPOS:
CLASS EXCLUS:
CLASS EXTEN :
STOP GAP    :
STOP GAP AGG:                                OCC:

LIQ LIAB BASE OVERRIDE: 625                  PRODUCTS BASE OVERRIDE   :
```

────────────────GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT────────────────

```
RMF           PKG MOD * PKG DEV * EXPER MOD * SCHED MOD *( COMP EXPNS + AGNT EXPNS - CONST )* OTHER MOD *
              1.0000    1.0000    1.0000      1.0000      1.0000       1.0000       1       1.0000
              TOT DEREG MOD =                                                                          RATE MOD
                 1.000                                                                                 1.0000
```

────────────────CLASS CODE/LOCATION GENL LIAB RATING FORMULAS────────────────

```
CLASS CODE : 70412        DESC : LIQUOR

PREM/OPS          BASE RATE =                                                   FINAL PREM
                  625.000                                                       625.00
                  ADDL FACTORS:   LOSS COST ADJ FCT 1.000
                  OPERATOR ENTERED OR OVERRODE THE BASE RATE.
```

────────────────STATE TOTAL (IL) = 26,495.00────────────────

────────────────POLICY TOTAL = 26,495.00────────────────

30507/CEH
Atty. No.: 41801

FILED

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

2015 JUL 23 PM 2: 57

BURLINGTON COAT FACTORY OF ILLINOIS, COOK
LLC, a/s/o CRYSTINE GOMEZ COUNTY, ILLINOIS
LAW DIVISION

        Plaintiff,                                          CLERK
                                            DOROTHY BROWN
v.                                                 No.    14-L-816

DELL CORPORATION, an Illinois Corporation,
and ROY ERIKSON OUTDOOR
MAINTENANCE, INC., an Illinois Corporation,

        Defendants.

_____

DELL CORPORATION,

        Defendant/Third-Party Plaintiff,

v.

FERRANDINO AND SON, INC., an Illinois
Corporation, WRIGHT ENTERTAINMENT
GROUP, INC. d/b/a HOLLYWOOD PARK, INC.,
an Illinois Corporation, and TARGET CORPORATION
d/b/a TARGET STORES f/k/a DAYTON-HUDSON
CORPORATION, an Illinois Corporation,

        Third-Party Defendants.

### DEFENDANT DELL CORPORATION'S AMENDED THIRD PARTY COMPLAINT AGAINST WRIGHT ENTERTAINMENT GROUP, INC.

The Defendant, DELL CORPORATION, by its attorneys, THE HUNT LAW GROUP,

LLC, pleading in the alternative and without prejudice to its other pleadings, for its Third-Party

Complaint against WRIGHT ENTERTAINMENT GROUP, INC., d/b/a HOLLYWOOD PARK,

INC. ("Wright") for Contribution, states as follows:

1.      The Plaintiff Burlington Coat Factory of Illinois, as subrogee of Crystine Gomez,

filed its Complaint at Law in this matter on January 24, 2014 against Defendants Dell Corporation

and Roy Erikson Outdoor Maintenance company seeking recovery of amounts paid as workers'

1



**EXHIBIT**

2

30507/CEH                                                                              Atty. No.: 41801

compensation to Crystine Gomez for a slip and fall purportedly suffered at or near the Burlington Coat Factory premises located at 13120 Rivercrest Drive in Crestwood, Illinois. (See Plaintiff's Amended Complaint, attached hereto as Exhibit A.)

2.     The Defendant, Dell Corporation, denies and continues to deny all material allegations against it.  (See Dell Corporation's Answer and Affirmative Defenses, attached hereto as Exhibit B.)

3.     The Burlington Coat Factory premises ("Burlington") located at 13120 Rivercrest Drive, City of Crestwood, County of Cook, Illinois is one parcel of a larger shopping complex known as the Rivercrest Shopping Center.

4.     At all times relevant to the Plaintiff's Complaint, Wright owned, operated, managed, maintained, controlled and/or was in charge of the premises located at 5051 Cal Sag Road, City of Crestwood, County of Cook, Illinois at or near the Rivercrest Shopping Center.

5.     At all times relevant to the Plaintiff's Complaint, Wright, acting through its agents, servants, and employees, assumed the duty of snow and ice removal operations for the parking areas and common areas adjacent to Burlington by hiring an outside snow removal contractor to perform snow and ice removal services on certain premises, including the parking areas and common areas adjacent to Burlington.

6.     Upon information and belief, the snow removal contractor hired by Wright performed snow and ice removal services in the area that is the subject of plaintiff's complaint, including at or near the location of Gomez's alleged fall.

7.     At all times relevant to the Plaintiff's Complaint, Wright knew or should have known that pedestrians would be walking upon the aforesaid premises.

30507/CEH                                                                                    Atty. No.: 41801

8.      At all times relevant to the Plaintiff's Complaint, it was the duty of Wright to exercise ordinary care and caution in the managing, coordinating, or scheduling snow removal operations of the aforesaid premises for the safety of pedestrians walking across said premises.

9.      At all times relevant to the Plaintiff's Complaint, Wright owed a duty to Plaintiff to exercise reasonable care in the managing, coordinating, or scheduling of snow and ice removal operations in the aforesaid premises.

10.     Notwithstanding the aforesaid duty, Wright, acting through its agents, servants, and employees, is guilty of one or more of the following careless and negligent acts or omissions:

      a.  Carelessly and negligently permitted the creation of an unnatural accumulation of snow and ice to be created by its snow removal contractor;

      b.  Carelessly and negligently caused the aforesaid premises to be hazardous due to an accumulation of snow and ice;

      c.  Carelessly and negligently failed to make a reasonable inspection of the work being performed in the aforesaid premises, including the removal of an accumulation of snow and ice;

      d.  Carelessly and negligently failed to supervise the work being performed in the aforesaid premises, including the removal of an accumulation of snow and ice;

      e.  Carelessly and negligently failed to ensure that proper snow and ice removal techniques were being employed in the aforesaid premises;

      f.  Carelessly and negligently failed to provide a safe ingress and egress across the aforesaid premises;

      g.  Carelessly and negligently failed to warn the plaintiff of unreasonably dangerous conditions at the aforesaid premises; and

30507/CEH                                                                    Atty. No.: 41801

    h.  Was otherwise careless and negligent.

    11.  As a direct and proximate result of one or more of the aforesaid negligent acts or omissions of Wright, the Plaintiff sustained personal and pecuniary injuries.

    12.  If the Plaintiff, Burlington Coat Factory of Illinois, LLC, prevails against the Defendant, Dell Corporation, then the Defendant is entitled to receive contribution from the Third-Party Defendant, Wright, based on the percentage of liability to which the liability or fault of the Third-Party Defendant, Wright, caused or contributed to cause the Plaintiff's alleged damages, pursuant to the Joint Tortfeasor Contribution Act, 740 ILCS 100/.01, *et seq*.

    WHEREFORE, the Defendant, DELL CORPORATION, demands judgment against the Third-Party Defendant, WRIGHT ENTERTAINMENT GROUP, INC., for its *pro rata* share of all sums that may be assessed against the Defendant, DELL CORPORATION, and for such further relief as this Court deems just and appropriate.

Respectfully submitted,

THE HUNT LAW GROUP, LLC

By: Courtney E. Healy

Brian J. Hunt
Courtney E. Healy
THE HUNT LAW GROUP, LLC
Attorney for Defendant – Dell Corporation.
20 N. Wacker Dr., Suite 1711
Chicago, Illinois 60606
(312) 384.2300
Attorney No.: 41801

4

## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE ("Amendment") is entered into as of this 5th day of October, 2010, by and among CENTRO BRADLEY SPE 3, LLC, a Delaware limited liability company, having an address at 40 Skokie Boulevard, Suite 600, Northbrook, Illinois 60062 ("Landlord"), and WRIGHT ENTERTAINMENT GROUP, INC., an Illinois corporation, having an address at 5051 Cal Sag Road, Crestwood, Illinois 60445, and doing business as "Hollywood Park" ("Tenant").

### RECITALS

A.     WHEREAS, Landlord's predecessor-in-interest and Tenant's predecessor-in-interest entered into that certain written Lease Agreement dated September 27, 1989, as amended by that certain written Amendment to Lease dated January 1, 1994, as further amended by that certain written Second Amendment to Lease dated June 22, 2005 (collectively, the "Lease") for the lease of the Leased Premises (as defined in the Lease), including the Building (as defined in the Lease) constituting certain retail space currently identified as Store No. 900, of approximately 15,000 square feet of space and the Adjacent Land (as defined in the Lease) consisting of approximately 128,790 square feet of land located adjacent to the Building, all as approximately depicted in Exhibit A attached hereto, in what is commonly referred to as Rivercrest Shopping Center, a shopping center located in the City of Crestwood, State of Illinois (as further identified in the Lease, the "Shopping Center").

B.     WHEREAS, the Lease is scheduled to expire on September 30, 2010.

C.     WHEREAS, Landlord and Tenant desire, among other things, to extend the term of the Lease.

### TERMS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Tenant, the parties agree as follows:

1.     **LEASE TERM.** Landlord and Tenant hereby agree to extend the term, as defined in the Lease, for a period of one hundred twenty (120) full calendar months from October 1, 2010 to September 30, 2020 ("Extended Term"), upon the following terms and conditions.  The term "Term" shall mean the term of this Lease, as extended by the Extended Term and any Option Terms (as defined below) pursuant to Section 3 of this Amendment.

2.     **MINIMUM RENT.** Tenant shall continue to tender Minimum Rent, and all other Rent, in accordance with the terms of Lease, without offset, deduction, or credit (except as expressly provided in the Lease), except that during the Extended Term Minimum Rent shall be as follows:

| Period | PSF | Annually | Monthly |
|--------|-----|----------|---------|
| 10/1/2010 – 9/30/2013 | $13.00 | $195,000.00 | $16,250.00 |
| 10/1/2013 – 9/30/2015 | $14.00 | $210,000.00 | $17,500.00 |
| 10/1/2015 – 9/30/2020 | $15.00 | $225,000.00 | $18,750.00 |

3.     **OPTION TO EXTEND THE LEASE TERM.** Tenant, by written notice to Landlord given no later than one hundred eighty (180) days prior to the expiration of the then current Term, shall have the option to further extend the term of the Lease for up to two (2) additional sixty (60) full calendar month periods (each an "Option Term"), pursuant to all of the terms, covenants, and conditions of the Lease and this Amendment, provided Tenant is not then in default hereunder after the expiration of any applicable notice and cure period.

4.     **OPTION TERM MINIMUM RENT.** Tenant shall continue to tender Minimum Rent, and all other Rent, in accordance with the terms of Lease, without offset, deduction, or credit (except as expressly provided in the Lease), except that during the Option Terms Minimum Rent shall be as follows:

| Period | PSF | Annually | Monthly |
|--------|-----|----------|---------|

Page 1 of 7

**EXHIBIT**

**3**

Rivercrest Shopping Center / BU: 415201
Hollywood Park

| | | | |
|---|---|---|---|
| 10/1/2020 – 9/30/2025 | $16.00 | $240,000.00 | $20,000.00 |
| 10/1/2025 – 9/30/2030 | $17.00 | $255,000.00 | $21,250.00 |

5.     COST OF MAINTENANCE OF COMMON AREAS. Commencing on October 1, 2010, Tenant's pro-rata share of expense for the CAM charges shall be reduced to an amount equal to One Thousand Five Hundred Sixty-Two and 50/100 Dollars ($1,562.50) per month, constituting one-twelfth of One and 25/100 Dollars ($1.25) per square foot of the gross Building area on an annualized basis, for the remainder of the Initial Lease Year (i.e. until September 30, 2011) of the Extended Term (the "Base Year").

6.     CAP ON COST OF MAINTENANCE OF COMMON AREAS. Through the end of the Base Year, Tenant shall pay its proportionate share of CAM charges in accordance with Section 5 of this Amendment. For each Lease Year following the Base Year throughout the remainder of the Term, Landlord agrees that any increase in the amount due by Tenant for its proportionate share of CAM charges exclusive of the costs for security, insurance, utilities and snow removal (the "Controllable Costs") shall not exceed the Controllable Costs for the Base Year paid by Tenant under the Lease, increased at the rate of four percent (4%) per Lease Year, calculated on an annualized, compounded and cumulative basis.

7.     TENANT'S WORK. Article XI of the Lease is here by amended by adding the following:

      a.    Tenant may not perform any major structural, mechanical, electrical or plumbing additions, alterations or repairs to the Leased Premises ("**Structural Alterations**"), and/or any other renovations, remodeling or alterations individually in excess of Ten Thousand Dollars ($10,000.00) each or in the aggregate in excess of Twenty Five Thousand Dollars ($25,000.00) per Lease Year to the Leased Premises ("**Significant Alterations**"), in each case without having first received the Landlord's written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall, before performing any Structural Alterations to the Leased Premises, submit complete architectural and engineering plans and specifications of the Leased Premises, prepared by architects and engineers, describing all of the Structural Alterations which Tenant proposes. Tenant shall, before performing any Significant Alterations to the Leased Premises, submit general plans and specifications describing all of the Significant Alterations which Tenant proposes. Upon approval by Landlord of Tenant's final plans and specifications therefor, which approval shall not be unreasonably withheld, conditioned or delayed, Tenant shall employ a contractor and sub-contractors to perform the Structural Alterations or the Significant Alterations, as applicable, in accordance with the said approved plans and specifications and in accordance with the other terms and provisions of this Section 7.

      b.    Plans and specifications required under Section 7(a) hereof for Structural Alterations shall show in sufficient detail the location of all utilities, partitions, store front and any other matters which may materially affect the structural, mechanical, electrical or plumbing systems of the Leased Premises. If any Structural Alterations will result in a modification to any portion of the structural system of the Leased Premises, the plans and specifications to be submitted by Tenant pursuant to Section 7(a) shall include plans produced by a structural engineer with respect to such structural system work for approval by Landlord in accordance with Section 7(a) prior to commencement of work.

      c.    Tenant acknowledges that Landlord's approval of Tenant's plans (i) does not eliminate the need for Tenant to obtain all necessary approvals and permits required from any public or governmental agency or authority having jurisdiction over the Shopping Center and (ii) should not be construed as a waiver of or the satisfaction of any laws, regulations, restrictions or requirements of record, conformance thereto being solely Tenant's responsibility. Tenant also acknowledges that Landlord has no liability to Tenant or any other person or entity as a

Rivercrest Shopping Center / BU: 415201
Hollywood Park

result of Landlord's approval of said plans for any defects, omissions, inconsistencies or shortcomings contained in such plans or the work to be performed in accordance therewith.

d.   All work or equipment relating to renovations, remodeling or alterations pursuant to this Section 7 shall be performed by Tenant at its own cost and expense and Tenant shall, without limitation, fully equip the Leased Premises with all trade equipment, furniture, operating equipment, furnishings, fixtures and exterior signs and any other equipment necessary for the proper operation of Tenant's business. Whenever Tenant is performing work within the Leased Premises, Tenant shall diligently prosecute such work to its completion as soon as is practical after its commencement. All fixtures installed by Tenant shall be new or completely reconditioned.

e.   Tenant agrees that Tenant's Work shall not be done in a manner which, in and of itself, would create any work stoppage, picketing, labor disruption or dispute (any such violation, stoppage, picketing or disruption hereinafter referred to as a "Conflict"). Tenant shall stop work or other activity if continuing such work or activity would cause a Conflict, immediately upon receipt of Landlord's written notice of such Conflict specifically identifying the cause of such Conflict. Tenant's violation of the terms hereof shall constitute a default under the Lease and shall entitle Landlord to exercise any remedies that are available to Landlord at law, in equity or hereunder, including, without limitation, obtaining an injunction.

f.   Tenant will indemnify and defend Landlord and save it harmless from and against any and all claims, actions, suits at law or equity, judgments, expenses, costs, liabilities, fines and debts in connection with any injury, loss or damage, to the extent arising as a result of Tenant's Work and not caused by any negligence or willful misconduct of Landlord or any of its employees, agents or contractors.

8.   REAL ESTATE TAXES.  Section 2.04 of the Lease is hereby amended by adding the following:

Landlord may contest any and all Real Estate Taxes and/or Landlord may retain tax counsel for the purpose of obtaining and maintaining the most reasonable attainable real estate tax upon the Shopping Center. Landlord agrees to use reasonable efforts to contest Real Estate Taxes in a manner similar to efforts being pursued by landlords of similar retail complexes containing similar tenants in the greater Chicago, Illinois metropolitan area; provided, however, in the event Landlord in good faith reasonably believes that the savings resulting from any such Real Estate Tax contest would be less than the costs incurred in connection therewith, Landlord shall not be required to conduct any Real Estate Tax contest. Landlord's tax counsel shall have the authority to present complaints, briefs and supporting data, including appraisals, before the appropriate agencies having jurisdiction over the assessment and levy of the real estate taxes affecting the Shopping Center. All of the reasonable costs of contesting any taxes and all of the reasonable fees and costs paid by Landlord for such services, including without limitation the costs of tax counsel, shall be included in Real Estate Taxes prior to the calculation of Tenant's share thereof and shall be Additional Rent. Landlord represents that Real Estate Taxes for 2008 and 2009 calendar years are currently under appeal with the Cook County Assessors office.

9.   EASEMENT ENFORCEMENT.  Landlord acknowledges that it is a party to that certain written Easement Agreement dated March 25, 1993 as Doc No. 93223679 in the Cook County Recorder of Deeds ("Easement"). In the event that the owner of the parcel(s) adjacent to the Premises fails to maintain said parcel(s) in accordance with the terms and conditions set forth therein to the detriment of Tenant or the Leased Premises, then Tenant shall promptly notify Landlord of same in writing. Promptly upon receipt of said notice from Tenant Landlord agrees that it shall use commercially reasonable efforts to enforce the terms and

Rivercrest Shopping Center / BU: 415201
Hollywood Park

provisions set forth therein against the other owner. Provided that Landlord uses commercially reasonable efforts to enforce the terms and provisions and provides Tenant evidence of the same, then, any failure on Landlord's behalf to enforce same shall not be deemed a default under this Lease or entitle Tenant to exercise any additional remedies including, but not limited to, self-help or offset rights.

10.     AS-IS. Tenant acknowledges that it is currently occupying the Leased Premises (this being a renewal lease) and, accordingly, Tenant is accepting the Leased Premises in its "AS-IS/WHERE-IS" condition with no work of any sort to be performed by Landlord and no representation or warranty by Landlord as to the fitness of the Leased Premises, or any equipment servicing the Leased Premises, or as to any use permitted herein. Any and all work to the Leased Premises necessary for Tenant to continue to operate its business in accordance with the terms of this Lease (the "Tenant's Work") shall be Tenant's obligation to perform at Tenant's sole cost and expense. Tenant will indemnify Landlord and save it harmless from and against any and all claims, actions, suits at law or equity, judgments, expenses, costs, liabilities, fines and debts in connection with any injury, loss or damage to the extent arising as a result of Tenant's Work, except to the extent arising as a result of any negligence or willful misconduct of Landlord or any of its employees, contractors or agents.

11.     NOTICE ADDRESS. The portion of the Lease regarding notice addresses is hereby deleted and the following addresses shall be used for Landlord and Tenant or to such other address or addresses as either such party may give to the other, from time to time, by notice as herein provided:

Landlord's Notice Address:
Centro Bradley SPE 3, LLC
c/o Centro Properties Group
420 Lexington Avenue, 7th Floor
New York, NY 10170
Attention:  Office of General Counsel, Property

With a copy to:
Centro Bradley SPE 3, LLC
c/o Centro Properties Group
40 Skokie Boulevard, Suite 600
Northbrook, IL 60062
Attn: Legal Department

Landlord's Address for Rent Payments:
Centro Bradley SPE 3, LLC
c/o Centro Properties Group
23676 Network Place
Chicago, IL 60673-3676

Tenant's Address for Notices:
Wright Entertainment Group, Inc.
5051 Cal Sag Road
Crestwood, IL 60445
Attn: President

With a copy to:
Daspin & Aument, LLP
227 West Monroe Street
Suite 3500
Chicago, IL 60606
Attn: Craig M. Gertz

Notices under the Lease shall be in writing and shall be sent by personal delivery, by registered or certified mail, return receipt requested, or by reputable overnight delivery service (e.g. Federal Express, UPS, or DHL),

Rivercrest Shopping Center / BU: 415201
Hollywood Park

and notice shall be deemed given upon receipt thereof, or when delivery was refused, whichever is earlier.

12.      RETROACTIVE. This Amendment is intended to be retroactively effective as of October 1, 2010.

13.      MISCELLANEOUS.

(a)      (i)      By the execution hereof, Tenant acknowledges the full and faithful performance by Landlord of the obligations to be performed by it under the Lease to the date hereof. To the best of Tenant's knowledge Landlord is not in default under the terms and conditions of the Lease, and that no condition exists which, with the passage of time or the giving of notice, would constitute a default under the terms and conditions of the Lease. Tenant has no present right to set off and no present defense or counterclaim against enforcement of Tenant's obligations under the Lease.

(ii)      By the execution hereof, Landlord acknowledges the full and faithful performance by Tenant of the obligations to be performed by it under the Lease to the date hereof. To the best of Landlord's knowledge Tenant is not in default under the terms and conditions of the Lease, and that no condition exists which, with the passage of time or the giving of notice, would constitute a default under the terms and conditions of the Lease.

(b)      The Lease and this Amendment set forth all the covenants, promises, agreements, conditions and understandings between the parties hereto concerning the Leased Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than as herein set forth. All prior communications, negotiations, arrangements, representations, agreements and understandings, whether oral, written or both, between the parties hereto, and their representatives, are merged herein and extinguished, the Lease and this Amendment superseding and canceling the same.

(c)      In the event of any conflict between the terms of the Lease and this Amendment, the terms of this Amendment shall prevail. Except as specifically provided herein, all of the terms, provisions, covenants and conditions of the Lease are hereby ratified and confirmed and shall continue in full force and effect.

(d)      The captions and headings throughout this Amendment are for convenience and reference only, and in the same shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision, or the scope or intent hereof, nor in any way affect this Amendment.

(e)      The individuals executing this Amendment hereby represent and warrant that they are empowered and duly authorized to so execute this Amendment on behalf of the parties they represent.

(f)      All terms not defined in this Amendment shall have the respective meanings ascribed to them in the Lease.

(g)      This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(h)      This Amendment may be executed in several counterparts, each of which may be deemed an original, but all of which together shall constitute one and the same Amendment.

(i)      This Amendment shall for all purposes be deemed to include, as though set out in full within, the following attached documents: Exhibit "A"

[Signature Page to Follow]

Rivercrest Shopping Center / BU: 416201
Hollywood Park

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

TENANT:
WRIGHT ENTERTAINMENT GROUP, INC.
an Illinois corporation

By: _____

Name: _____

Its: _____

LANDLORD:
CENTRO BRADLEY SPE 3, LLC
a Delaware limited liability company

By: _____
Name: Bruce Heitzinger
Its: Senior Vice President

Rivercrest Shopping Center / BU: 415201
Hollywood Park

EXHIBIT A

Rivercrest Shopping Center



Leased Premises
Store No. 900

Leased Premises



93223679

OPERATION AND EASEMENT AGREEMENT

BETWEEN

DAYTON HUDSON CORPORATION

AND

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,
NOT PERSONALLY BUT SOLELY AS TRUSTEE
UNDER TRUST AGREEMENT DATED JULY 15, 1989,
AND KNOWN AS TRUST NO. 108951-00

AND

OPUS NORTH CORPORATION

THIS DOCUMENT PREPARED BY AND
AFTER RECORDING RETURN TO:

Alan J. Salle
Rudnick & Wolfe
203 North LaSalle Street
Suite 1800
Chicago, Illinois 60601

Southwest corner of Calumet Sag Road
and Rivercrest Avenue
Crestwood, Illinois

PINS: 24-23-408-001, 24-23-408-002
24-23-408-003, 24-23-408-004
24-23-408-005, 24-23-408-006

AJS2019 03/16/93 1600



EXHIBIT
4

## TABLE OF CONTENTS

**Article**                                                                  **Page**

1     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.1    Approving Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.2    Building Appurtenances . . . . . . . . . . . . . . . . . . . . . . 2
    1.3    Building Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.4    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.5    Constant Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.6    Floor Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.7    Kohl's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.8    Menard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.9    Occupant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.10   Outside Sales Area . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.11   Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.12   Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.13   Permittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.14   Restaurant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.15   Stormwater System . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.16   Tract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.17   Tree Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    1.18   Utility Lines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2     EASEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.1    Ingress and Egress . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.2    Outlot Tract Ingress and Egress . . . . . . . . . . . . . . . . 5
    2.3    Lot 6 Tract Ingress and Egress. . . . . . . . . . . . . . . . . . 6
    2.4    Storm Drainage and Runoff. . . . . . . . . . . . . . . . . . . . 6
    2.5    Stormwater System . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.6    Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3     CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.1    General Requirements . . . . . . . . . . . . . . . . . . . . . . . 7
    3.2    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    3.3    Building Improvements . . . . . . . . . . . . . . . . . . . . . . 11

4     MAINTENANCE AND REPAIR . . . . . . . . . . . . . . . . . . . . . 13
    4.1    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.2    Building Improvements and Outside Sales Area . . . . . . . . . . . . . . . 15

5     OPERATION OF THE SHOPPING CENTER . . . . . . . . . . . . . . . . . . . 15
    5.1    Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    5.2    Lighting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    5.3    Occupant Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    5.4    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    5.5    Taxes and Assessments . . . . . . . . . . . . . . . . . . . . . . 23
    5.6    Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

| Article | | | Page |
|---|---|---|---|
| 6 | **MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 24 |
| | 6.1 | Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| | 6.2 | Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| | 6.3 | Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| | 6.4 | Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| | 6.5 | Approval Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| | 6.6 | Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| | 6.7 | Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
| | 6.8 | Construction and Interpretation . . . . . . . . . . . . . . . . . . . | 29 |
| | 6.9 | Negation of Partnership . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| | 6.10 | Not a Public Dedication . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| | 6.11 | Excusable Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| | 6.12 | Mitigation of Damages . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| | 6.13 | OEA Shall Continue Notwithstanding Breach . . . . . . . . . . . . . | 30 |
| | 6.14 | Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| | 6.15 | No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| 7 | **TERM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 31 |
| | 7.1 | Term of this OEA . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| 8 | **EXCULPATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 31 |
| | 8.1 | Exculpation of Owner . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| | 8.2 | Limited Liability of Owner . . . . . . . . . . . . . . . . . . . . . | 31 |
| | 8.3 | Limited Liability of Opus . . . . . . . . . . . . . . . . . . . . . . | 31 |
| | 8.4 | Limited Liability of Target . . . . . . . . . . . . . . . . . . . . . | 31 |

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Legal Description of the Target Tract |
| Exhibit B | - | Legal Description of the Lot 6 Tract |
| Exhibit C | - | Legal Description of the Outlot Tract |
| Exhibit D | - | Legal Description of the Detention Pond Tract |
| Exhibit E | - | Legal Description of the Opus Tract |
| Exhibit F | - | Submission Guidelines |
| Exhibit G | - | Design of Pylon Sign |
| Exhibit H | - | Sign Criteria |
| Exhibit X | - | Site Plan |

## OPERATION AND EASEMENT AGREEMENT

THIS OPERATION AND EASEMENT AGREEMENT ("OEA") is made and entered into as of the 25th day of March, 1993, by and among DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target"), AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, not personally, but solely as Trustee under Trust Agreement dated July 15, 1989 and known as Trust No. 108951-00 ("Owner"), and OPUS NORTH CORPORATION, an Illinois corporation ("Opus").

### W I T N E S S E T H:

WHEREAS, Target is the owner of a certain tract of land containing approximately 10.55 acres, legally described in Exhibit A attached hereto and identified as the "Target Tract" on Exhibit X (the "Site Plan") attached hereto; and

WHEREAS, Owner is the owner of a certain tract of land containing approximately 3.52 acres, legally described in Exhibit B attached hereto and identified as the "Lot 6 Tract" on the Site Plan; and

WHEREAS, Owner is the owner of a certain tract of land containing approximately 0.85 acres, legally described in Exhibit C attached hereto and identified as the "Outlot Tract" on the Site Plan; and

WHEREAS, Owner is the owner of a certain tract of land containing approximately 3.39 acres, legally described in Exhibit D attached hereto and identified as the "Detention Pond Tract" on the Site Plan; and

WHEREAS, Opus is the owner of a certain tract of land containing approximately 13.47 acres, legally described in Exhibit E attached hereto and identified as the "Opus Tract" on the Site Plan; and

WHEREAS, the Lot 6 Tract, the Outlot Tract and the Detention Pond Tract are collectively referred to herein as the "Owner Tract"; and

WHEREAS, the Target Tract, the Owner Tract, and the Opus Tract (collectively, the "Shopping Center") are contiguous and adjacent to each other as shown on the Site Plan; and

WHEREAS, the signatories hereto intend to develop and operate their respective Tracts in conjunction with each other as integral parts of a retail shopping complex, and in order to effectuate the common use and operation thereof, they desire to enter into certain covenants and agreements as a part of a general plan, and to grant to each other certain reciprocal easements in, to, over and across their respective Tracts.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth and in furtherance of the parties' understanding, it is agreed as follows:

AJS2019.03/16/93.1600

## ARTICLE 1

## DEFINITIONS

1.1     **Approving Party.** "Approving Party" shall mean the Party designated from time to time to make certain decisions and/or give certain approvals pursuant to the terms of this OEA. There shall be (i) one Approving Party representing the Opus Tract, (ii) one Approving Party representing the Owner Tract, and (iii) one Approving Party representing the Target Tract. Each Approving Party shall have absolute discretion to make the decisions and/or give the approvals expressly designated to be made and/or given on behalf of the real estate represented by such position regardless of whether the Approving Party then owns all or less than all of such real estate. The holder of the Approving Party position shall have the right to assign, in writing, such position to any other Party owning a Tract within the Opus Tract, the Owner Tract, or the Target Tract, as the case may be, but if an assignment is not made and the other Parties notified of same, then such Approving Party position shall automatically be deemed assigned to the Party acquiring the last Tract owned by the transferring Approving Party. In addition, the Approving Party for the Opus Tract shall have the right to assign, in writing, the Approving Party position for the Opus Tract to Kohl's so long as Kohl's is a tenant of the Opus Tract, during all or a portion of the term of the Kohl's lease, provided that all Parties are notified of such assignment. If the Approving Party position is assigned to Kohl's, then upon the expiration of the term of the Kohl's lease, the Approving Party position for the Opus Tract shall revert to the prior Approving Party for the Opus Tract, unless such reversion right has been assigned by such prior Approving Party to a Party owning a Tract within the Opus Tract in which event the Approving Party position for such Tract shall revert to the assignee. Opus shall be the initial Approving Party for the Opus Tract; Owner shall be the initial Approving Party for the Lot 6 Tract, the Outlot Tract and the Detention Pond Tract; Target shall be the initial Approving Party for the Target Tract.

1.2     **Building Appurtenances.** "Building Appurtenances" shall mean and include any canopies, supports, storage, loading and receiving docks or areas, truck ramps and other outward extensions and dumpster storage areas which are appurtenant to a building constructed, placed or located in the Shopping Center.

1.3     **Building Area.** "Building Area" shall mean the limited areas of the Shopping Center within which buildings, Building Appurtenances and Outside Sales Areas may be constructed, placed or located, comprised of (i) the building footprints designated on the Site Plan, (ii) those limited areas of the Shopping Center adjacent to the building footprints which are used from time to time for Building Appurtenances, and (iii) Outside Sales Areas.

1.4     **Common Area.** "Common Area" shall mean all areas within the exterior boundaries of the Shopping Center which are available for the common use and benefit of the Parties and any other Occupants, exclusive of (i) buildings, (ii) Building Appurtenances and (iii) any Outside Sales Area.

1.5     **Constant Dollars.** "Constant Dollars" shall mean the present value of the dollars to which such phrase refers. An adjustment shall occur on January 1 of the sixth calendar year following the date of this OEA, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during which this OEA

AJS2019 03/16/93 1600                    2

is dated; the "Current Index Number" shall be the level of the Index for the month of September of the year preceding the adjustment year; the "Index" shall be the Implicit Price Deflator of the Gross National Product of the United States, published by the United States Department of Commerce (base year 1972=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then the Approving Parties shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

1.6     Floor Area.   "Floor Area" shall mean the actual number of square feet of space contained on each floor within a building, as measured from the exterior faces of the exterior walls or storefront and/or the centerline of any common walls and unless excluded below, shall include any mezzanine or basement space; provided, however, that the following areas shall not be included in Floor Area:   Outside Sales Areas; office space used by an Occupant for administrative purposes and which is not open or accessible to the general public; the upper levels of any multi-deck/platform areas used for storage of merchandise; and any space used for building utilities or mechanical equipment. Within thirty (30) days of receipt of a request therefor, a Party shall certify to the requesting Party the amount of Floor Area in each building on its Tract. If any Party causes an as-built survey to be prepared with respect to any portion of the Shopping Center, such Party shall furnish a copy of such survey to the other Parties for informational purposes only.

During any period of rebuilding, repairing, replacement or reconstruction of a building, the Floor Area of that building shall be deemed to be the same as existed immediately prior to that period. Upon completion of such rebuilding, repairing, replacement or reconstruction, the Party upon whose Tract such building is located shall cause a new determination of Floor Area for such building to be made in the manner described above, and such determination shall be sent to any Party requesting the same.

1.7.   Kohl's.   "Kohl's" shall mean Kohl's Department Stores, Inc., a Delaware corporation.

1.8     Menard.   "Menard" shall mean Menard, Inc., a Wisconsin corporation.

1.9     Occupant.   "Occupant" shall mean any Person from time to time entitled to the use and occupancy of any portion of a building in the Shopping Center under an ownership right or any lease, sublease, license, concession or other similar agreement.

1.10   Outside Sales Area.   "Outside Sales Area" shall mean that certain space designated on the Site Plan which from time to time may be used exclusively by an Occupant of the adjacent building for sales, display and/or storage purposes. During the period an Outside Sales Area is:  (i) used, such space shall be enclosed by a fence or other security barrier, and (ii) not used, the surrounding barrier, if any, shall be removed and the surface of such space shall be used for Common Area purposes or for buildings.

1.11   Party.   "Party" shall mean each signatory hereto and, after compliance with the notice requirements set forth below, their respective successors and assigns who become owners of any portion of the Shopping Center. Each Party shall be liable for the performance of all covenants, obligations and undertakings herein set forth with respect to the portion of the

Shopping Center owned by it which accrue during the period of such ownership, and such liability shall continue with respect to any portion transferred until the notice of transfer set forth below is given, at which time the transferring Party's liability for such covenants, obligations and undertakings shall terminate. A Party transferring all or any portion of its interest in the Shopping Center shall give prompt notice to all other Parties of such transfer and shall include therein at least the following information:

    (i)    the name and address of the new Party;

    (ii)    a copy of the legal description of the portion of the Shopping Center transferred; and

    (iii)    whether or not the transferee is the designated Approving Party for the applicable Tract.

If the Opus Tract, the Target Tract, the Lot 6 Tract, the Outlot Tract, or the Detention Pond Tract is owned by more than one Person, the Person or Persons holding at least fifty-one percent (51%) of the ownership interest in such Tract shall designate one of their number to represent all owners of such Tract and such designated Person shall be deemed the Party for such Tract. Until the notice of transfer is given, the transferring Party shall (for the purpose of this OEA only) be the transferee's agent.

Nothing contained herein to the contrary shall affect the existence, priority, validity or enforceability of any lien permitted hereunder which is placed upon the transferred portion of the Shopping Center prior to receipt of the foregoing notice.

1.12 **Person.** "Person" shall mean any individual, partnership, firm, association, corporation, trust or any other form of business or government entity.

1.13 **Permittee.** "Permittee" shall mean all Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees, subtenants and concessionaires of Occupants insofar as their activities relate to the intended use of the Shopping Center. Among others, Persons engaging in the following activities on the Common Area will not be considered to be Permittees:

    (i)    Exhibiting any placard, sign or notice;

    (ii)    Distributing any circular, handbill, placard or booklet;

    (iii)    Soliciting memberships or contributions;

    (iv)    Parading, picketing or demonstrating; and

    (v)    Failing to follow rules and regulations relating to the use of the Shopping Center.

1.14 **Restaurant.** "Restaurant" shall mean any operation or business which requires a governmental permit, license and/or authorization to prepare and/or serve food for either on-site or off-site consumption.

1.15  <u>Stormwater System</u>.  "Stormwater System" shall mean the facilities and systems in the Shopping Center constructed for the drainage and storage of surface water, which have been installed to provide common service to at least two (2) Tracts, including, without limitation, the detention pond on the Detention Pond Tract and the common storm sewers.

1.16  <u>Tract</u>.  "Tract" shall mean that portion of the Shopping Center owned by a Party.

1.17  <u>Tree Area</u>.  "Tree Area" shall mean that portion of the Common Area on the Opus Tract designated as such on the Site Plan.

1.18  <u>Utility Lines</u>.  "Utility Lines" shall mean those facilities and systems for the transmission of utility services, other than the Stormwater System.

## ARTICLE 2

### EASEMENTS

2.1  <u>Ingress and Egress</u>.  During the term of this OEA, each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use, and for the passage and accommodation of pedestrians over and across the parking, driveway and sidewalk areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use.  Such easement rights shall be subject to the following reservations as well as any other applicable provisions contained in this OEA:

    (i)    Each Party further reserves the right to close off its portion of the Common Area for such reasonable period of time as may be legally necessary, in the opinion of such Party's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Common Area, as herein provided, such Party shall give written notice to each other Party of its intention to do so, and shall attempt to coordinate such closing with each other Party so that no unreasonable interference with the passage of pedestrians or vehicles shall occur;

    (ii)    The easement rights granted pursuant to this Section 2.1 shall not be applicable to construction activities taking place in the Shopping Center; and

    (iii)    Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a Permittee from using its portion of the Common Area.

2.2  <u>Outlot Tract Ingress and Egress</u>.  Target hereby grants and conveys to Owner for its use and the use of its Permittees, in common with others entitled to use the same, a

AJS2019 03/16/93 1600                    5

perpetual, non-exclusive easement solely for the passage of pedestrians and vehicles to the Outlot Tract from Rivercrest Drive and for the passage of pedestrians and vehicles to Rivercrest Drive from the Outlot Tract over and across a thirty-foot (30') wide strip of land contained within the Target Tract (the "Outlot Easement Strip"); the center line of which Outlot Easement Strip is a line parallel with and fifteen feet (15') to the southwest of the southwestern boundary of the Outlot Tract, the southeastern boundary of which Outlot Easement Strip is the most southeastern boundary of the Target Tract, and the northwestern boundary of which Outlot Easement Strip is a projection of the northwestern boundary of the Outlot Tract (extended southwesterly). The easement rights granted pursuant to this Section 2.2 shall be subject to the reservations set forth in Section 2.1(i) and Section 2.1(iii) as well as any other applicable provisions contained in this OEA.

    2.3    <u>Lot 6 Tract Ingress and Egress</u>.  Target hereby grants and conveys to Owner for its use and the use of its Permittees, in common with other entitled to use the same, a perpetual, non-exclusive easement solely for the passage of pedestrians and vehicles to the Lot 6 Tract from Rivercrest Drive and for the passage of pedestrians and vehicles to Rivercrest Drive from the Lot 6 Tract over and across a thirty-foot (30') wide strip of land contained within the Target Tract (the "Lot 6 Easement Strip"). The Lot 6 Easement Strip shall initially be the southeast 640.00 feet of the southwest thirty feet (30') of the Target Tract. The easement rights granted pursuant to this Section 2.3 shall be subject to the reservations set forth in Section 2.1(i) and Section 2.1(iii) as well as any other applicable provisions contained in this OEA.

    2.4    <u>Storm Drainage and Runoff</u>.  Each Party hereby grants and conveys to each other Party owning an adjacent Tract the perpetual right and easement to discharge surface storm drainage and/or runoff from the grantee's Tract over, upon and across the Common Area of the grantor's Tract, provided that no Party shall alter or permit to be altered the surface of the Common Area or the drainage/retention system constructed on its Tract if such alteration would (i) materially increase the rate of flow of surface water onto an adjacent Tract either in the aggregate or by directing the rate of flow of surface water to a limited area, or (ii) increase the rate of flow of surface water in a manner which would cause the Stormwater System to exceed its capacity.

    2.5    <u>Stormwater System</u>.  Each Party hereby grants and conveys to each other Party non-exclusive perpetual easements in, to, over, under, along and across those portions of the Shopping Center where the Stormwater System is located (including the Detention Pond Tract) for the purpose of using the Stormwater System to discharge and store surface and subsurface stormwater drainage and/or runoff from the Shopping Center. No Party shall erect any buildings, structures or other improvements on or over the Detention Pond Tract or in any way interfere with the use of the Stormwater System by the Parties.

    2.6    <u>Restriction</u>.  No Party shall grant any easement for the purpose set forth in this Article for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of easements by a Party on its Tract to governmental or quasi-governmental authorities or to public utilities.

AJS2019 03/16/93 1600             6

# ARTICLE 3

## CONSTRUCTION

3.1    General Requirements.

(A)    Each Party agrees that all construction activities performed by it within the Shopping Center shall be performed in compliance with all applicable laws, rules, regulations, orders and ordinances of the city, county, state and federal government, or any department or agency thereof. Every building shall be equipped with automatic sprinkler systems.

(B)    Each Party further agrees that its construction activities shall not:

      (i)       cause any unreasonable increase in the cost of constructing improvements upon another Party's Tract;

      (ii)      unreasonably interfere with construction work being performed on any other part of the Shopping Center;

      (iii)     unreasonably interfere with the use, occupancy or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees;

      (iv)     cause any building located on another Tract to be in violation of any law, rule, regulation, order or ordinance authorized by any city, county, state or federal government, or any department or agency thereof.

(C)    Each Party agrees to defend, indemnify and hold harmless each other Party from all claims, losses, liabilities, actions, proceedings and costs (including reasonable attorneys' fees and costs of suit), including liens, and from any accident, injury or loss or damage whatsoever occurring to any Person or to the property of any Person arising out of or resulting from any construction activities performed or authorized by such indemnifying Party; provided, however, that the foregoing shall not be applicable to events or circumstances caused by the negligence or willful act or omission of such indemnified Party, its licensees, concessionaires, agents, servants, employees, or anyone claiming by, through or under any of them.

(D)    In connection with any construction, reconstruction, repair or maintenance on its Tract, each Party reserves the right to create a temporary staging and/or storage area in the Common Area on its Tract at such location as will not unreasonably interfere with access between such Tract and the other areas of the Shopping Center. Prior to the commencement of any work which requires the establishment of a staging and/or storage area on its Tract, a Party shall give the Approving Parties at least thirty (30) days prior notice of the proposed location of such staging and/or storage area; provided, however, that if a business is operating on the Target Tract or the Opus Tract, then no other Party's staging and/or storage area shall be located within three hundred (300) feet of the front door of the building on the Target Tract or the Opus Tract, as the case may be, and, if substantial work is to be performed, the constructing Party shall, at the request of any Approving Party, fence off such staging and/or storage area. All storage of materials and the parking of construction vehicles, including

vehicles of workers, shall occur only on the constructing Party's Tract, and all laborers, suppliers, contractors and others connected with such construction activities, except with respect to those taking place on the Outlot Tract and the Lot 6 Tract, shall use only the access points located upon the constructing Party's Tract. Laborers, suppliers, contractors and others connected with such construction activities on the Outlot Tract shall use only the access point to the Outlot Tract created by the easement granted in Section 2.2 hereof. Laborers, suppliers, contractors and others connected with such construction activities on the Lot 6 Tract shall use only access points to the Lot 6 Tract created by easements granted over the Opus Tract. Upon completion of such work, the constructing Party shall restore the affected Common Area to a condition equal to or better than that existing prior to commencement of such work.

(E)     Each Party hereby grants and conveys to each other Party and to its respective contractors, materialmen and laborers a temporary license for access and passage over and across the Common Area of the grantor's Tract as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Tract; provided, however, that such license shall be in effect only during periods when actual construction and/or maintenance is being performed and provided further that the use of such license shall not unreasonably interfere with the use and operation of the Common Area by others. Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license, and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by Section 5.4(C) hereof. Any Party availing itself of such temporary license shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, shall keep the grantor's Tract in a clean and safe condition, and shall promptly clean the area and restore the affected portion of the Common Area to a condition which is equal to or better than the condition which existed prior to the commencement of such work. Notwithstanding the foregoing, in the event a dispute exists between the contractors, laborers, suppliers and/or others connected with such construction activities, each Party shall have the right to prohibit the contractors, laborers, suppliers and/or others working for another Party from using the Common Area on its Tract.

3.2     Common Area.  The Parties have agreed that the Common Area of the Shopping Center shall be initially constructed as shown on the Site Plan; provided, however, except as provided in Section 3.2(D) below, no fence or other barrier which would prevent or unreasonably obstruct the passage of pedestrian or vehicular travel shall be erected or permitted within or across the Common Area, exclusive of the limited curbing and other forms of traffic control depicted on the Site Plan. Contemporaneously with the construction of a building upon its Tract, the constructing Party shall cause the Common Area on its Tract to be substantially completed no later than the day on which the first Occupant of such Tract opens for business with the public. Such work shall be done in a good and workmanlike manner and in accordance with good engineering standards; provided, however, the following minimum general design standards shall be complied with:

(A)     The lighting system shall be designed to produce a minimum maintained lighting intensity measured at grade at all points in the Common Area of 2.0 foot-candle; provided, however, that the extreme edge of the parking or driveway areas may have a minimum maintained lighting intensity measured at grade of 1.0 foot-candle; and provided further that the driveway areas immediately in front of the entrance to any building shall have a minimum maintained lighting intensity measured at grade of 5.0 foot-candles. Each Party may elect to control the lighting system located on its Tract. The type and design of the Common Area light

AJS2019 03/16/93 1600                          8

standards shall be consistent with the other phases of Rivercrest Shopping Center and shall be approved by the Approving Parties.

(B)     The slope in the parking area shall not exceed a maximum of four percent (4%), nor be less than a minimum of one percent (1%).

(C)     All sidewalks and pedestrian aisles shall be comprised of concrete or other approved materials; the automobile parking areas, drives, and access roads shall be designed in conformity with the recommendations of a registered soil engineer approved by the Approving Parties which shall require the installation of a suitable base and the surfacing with an asphaltic concrete or concrete wearing material.

(D)     All Utility Lines shall be underground at depths designated by consultants approved by the Approving Parties except:

(i)      ground-mounted electrical transformers;

(ii)     as may be necessary during periods of construction, reconstruction, repair or temporary service;

(iii)    as may be required by governmental agencies having jurisdiction over the Shopping Center;

(iv)    as may be required by the provider of such service; and

(v)     fire hydrants.

(E)     Except as otherwise provided below, the parking area on the Target Tract, the Opus Tract, the Outlot Tract and the balance of the Owner Tract each shall contain sufficient ground-level, parking spaces in order to comply with the following minimum requirements:

(i)      five (5.0) parking spaces for each one thousand (1,000) square feet of Floor Area; provided, however, that compact car parking spaces shall be located only in the areas, if any, designated on the Site Plan.

(ii)     if a business use contains a drive-up unit (such as remote banking teller or food ordering/dispensing facility), then there shall also be created space for stacking not less than five (5) automobiles for each drive-up unit.

(iii)    for each single Restaurant which has at least one thousand five hundred (1,500) square feet of Floor Area, but less than five thousand (5,000) square feet of Floor Area, then five (5) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use.

(iv)    for each single Restaurant which has at least five thousand (5,000) square feet of Floor Area, but less than seven thousand (7,000) square feet of Floor Area, then ten (10)

additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use.

(v)      for each single Restaurant which has seven thousand (7,000) square feet of Floor Area or more, then fifteen (15) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use.

Notwithstanding anything to the contrary contained in this Section 3.2(E)(i), if the Opus Tract is constructed as indicated on the Site Plan, the parking area on the Opus Tract shall be required to contain only 792 ground level parking spaces, and (ii) the Lot 6 Tract shall be required to contain only 24 ground level parking spaces. If the facility on the Lot 6 Tract is expanded, there shall be added to the Lot 6 Tract at least four and one-half (4.5) parking spaces for each one thousand (1,000) square feet of Floor Area added to such facility.

If an Occupant operates a Restaurant incidentally to its primary business purpose, then so long as such incidental operation continues, the portion of the Floor Area occupied by such Restaurant shall be excluded from the application of (iii), (iv) and (v) above. For the purpose of this clause only, a Restaurant shall be an "incidental operation" if it occupies less than seven percent (7%) of the Occupant's Floor Area and does not have a separate customer entry/exit door to the outside of the building. For the purpose of this Paragraph 3.2(E) only, the miniature golf course facility contained on the Owner Tract shall be excluded from the definition of "Restaurant" so long as the portion of such facility which is dedicated for restaurant use does not increase by more than ten percent (10%) from that portion used for restaurant use on the date hereof. If the portion of such miniature golf course facility which is dedicated for restaurant use increases by more than ten percent (10%) from that portion used for restaurant use on the date hereof, such facility shall be included in the definition of "Restaurant", but during the term of the existing tenant's lease (as said term may be extended pursuant to the terms of such lease), the first 3,000 square feet of space which is dedicated for restaurant use shall be excluded from the application of (iii), (iv) and (v) above.

In the event of a condemnation of part of a Tract or a sale or transfer in lieu thereof that reduces the number of usable parking spaces below that which is required herein, the Party whose Tract is so affected shall use its best efforts (including using proceeds from the condemnation award or settlement) to restore and/or substitute ground level parking spaces in order to comply with the parking requirements set forth above; provided, however, the Party whose Tract is so affected shall not be required to expend funds in excess of the proceeds from the condemnation award or settlement. If such compliance is not possible, such Party shall not be deemed in default hereunder, but such Party shall not be permitted to expand the amount of Floor Area located upon its Tract. If such Floor Area is thereafter reduced, then it may not subsequently be increased unless the foregoing parking requirement is satisfied.

(F)      No Party shall make changes to the improved Common Area on its Tract without the approval of the Approving Parties, except that each Party hereby reserves the right, from time to time without obtaining the consent or approval of any other Party, to make at its own expense any insignificant change, modification or alteration in its portion of the Common Area, including the installation of convenience facilities such as mailboxes, public telephones and benches, provided that:

(i)     the accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center) is not unreasonably restricted or hindered, and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan;

(ii)     except during such reasonable periods of time that the parking area located on a Party's Tract may be closed for repair, maintenance or restoration, there shall be maintained at all times within such Common Area, a sufficient number of vehicular parking spaces to meet the parking requirements set forth in Section 3.2(E), as well as all governmental rules, regulations and/or ordinances relating to parking requirements, but without reliance on parking spaces that may be available on another Tract, and in no event shall more than two percent (2%) of the parking spaces depicted on the Site Plan for such Tract be eliminated;

(iii)     no governmental rule, ordinance or regulation shall be violated as a result of such action, and such action shall not result in any other Party being in violation of any governmental rule, ordinance or regulation;

(iv)     no change shall be made in the access points between the Common Area and the adjacent public streets; provided, however, that additional access points may be created with the approval of the Approving Parties, which approval shall not be unreasonably withheld; and

(v)     at least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each other Party copies of the plans therefor, and provided further that such work shall not occur between October 1st and the following January 31st.

(G)     The provisions of this Section 3.2 do not apply to any changes, modifications or alterations of Common Area located within Building Areas which result from or arise out of the construction or maintenance of buildings or Outside Sales Areas.

### 3.3   Building Improvements.

(A)     While it is acknowledged and agreed that no Party shall have an obligation to either commence construction or complete construction, once started, of any building on its Tract, the Parties hereby agree that (i) all buildings, Building Appurtenances and Outside Sales Areas shall be located only within the Building Areas, (ii) that all buildings shall be located only within the building footprints designated on the Site Plan, and (iii) that all Outside Sales Areas shall be located only within the Outside Sales Areas designated on the Site Plan.

(B) Each Party shall submit to the Approving Parties detailed plans ("Plans") as required by Exhibit F attached hereto covering the initial construction of each building and any additions, remodeling, reconstruction or other alteration which changes the exterior thereof for approval prior to the commencement of any such work. Upon the issuance of any disapproval or recommendation for change, the submitting Party and the Approving Parties shall mutually consult to establish approved Plans for the proposed work. The Approving Parties shall not arbitrarily or unreasonably withhold approval of the Plans or recommend changes in the Plans which otherwise conform with the requirements of this OEA, nor shall they withhold approval of exterior remodeling or exterior reconstruction which does not either substantially enlarge an existing structure, or substantially change an existing structure. In no event shall an Approving Party require any other Party to utilize design standards superior to those utilized by the Approving Party in the construction of buildings on its Tract. Approval of Plans by the Approving Parties shall not constitute assumption of responsibility for the accuracy, sufficiency, or propriety thereof, nor shall such approval constitute a representation or warranty that the Plans comply with applicable laws. No material deviation shall be made from the approved Plans. Notwithstanding anything to the contrary contained herein, the Approving Parties agree that if a "prototype Target building" is initially constructed on the Target Tract or if a national merchant occupying more than fifty thousand (50,000) square feet of Floor Area (such as Kohl's and Menard) initially constructs its prototype building on the Opus Tract, or if such buildings are remodeled, reconstructed, expanded or otherwise altered by a national merchant occupying more than fifty thousand (50,000) square feet of Floor Area in the Shopping Center in conformance with the prototype building plans for such national merchant, then the requirement for the submission of Plans for such building is waived.

(C) No building or other structure (exclusive of the Pylon Sign referred to in Section 5.3 hereof) shall exceed the following height restrictions:

| | | | |
|------|-----------------------------|---|------------------------|
| (i)   | On the Target Tract          | - | 35 feet                |
| (ii)  | On the Opus Tract            | - | 35 feet                |
| (iii) | On the Outlot Tract          | - | 24 feet (1 story only) |
| (iv)  | Balance of the Owner Tract   | - | 35 feet                |

The height of any building shall be measured perpendicular from the finished floor elevation to the top of the roof structure, including any screening, parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such building. Any Party shall have the right to install, maintain, repair, replace and remove Communications Equipment on the top of the building on its Tract which may extend above the height limits established above; provided, however, such Communications Equipment shall be set back from the front of the building to reduce visibility thereof by customers. As used herein, the phrase "Communications Equipment" means such things as satellite and microwave dishes, antennas and laser heads, together with associated equipment and cable.

(D) At all times during the term of this OEA, there shall be not more than one (1) building or structure erected on the Outlot Tract. The Floor Area of such building or structure

AJS2019 03/16/93 1600         12

erected on the Outlot Tract shall not exceed ten thousand (10,000) square feet. The building or structure erected on the Outlot Tract shall be a one (1) story building, exclusive of subsurface levels.

## ARTICLE 4

## MAINTENANCE AND REPAIR

### 4.1   Common Area.

(A)     Each Party, at its sole cost and expense, shall (1) maintain, or cause to be maintained, the Common Area on its Tract in a safe condition and a good state of repair and condition and (ii) mow and keep litter-free the unimproved Common Area on its Tract. The minimum standard of maintenance for the improved Common Area shall be comparable to the standard of maintenance followed in other phases of Rivercrest Plaza Shopping Center; notwithstanding the foregoing, however, the Common Area shall be operated and maintained in compliance with all applicable governmental laws, rules, regulations, orders and ordinances, and the provisions of this OEA. All Common Area improvements shall be repaired or replaced with materials of a quality which is at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony of the Shopping Center as a whole. Such maintenance and repair obligation shall include, but not be limited to, the following:

(i)     Drive and Parking Areas. Maintaining all paved surfaces and curbs in a smooth and evenly covered condition including, without limitation, replacement of base, skin patch, resealing and resurfacing (for the purpose of this section, an overlay of the drives and parking areas shall be considered a maintenance item).

(ii)     Debris and Refuse. Periodic removal of all papers, debris, filth, refuse, ice and snow (2" on surface), including daily vacuuming and broom sweeping to the extent necessary to keep the Common Area in a first-class, clean and orderly condition. All sweeping shall be performed at appropriate intervals during such times as shall not interfere with the conduct of business or use of the Common Area by persons intending to conduct business with Occupants of the Shopping Center.

(iii)     Signs and Markers. Maintaining, cleaning, and replacing any appropriate directional sign or markers, including any handicapped parking signs. Restriping parking lot and drive areas at least semi-annually, and keeping clearly marked fire lanes, loading zones, no parking areas and customer cross-walks.

(iv)     Lighting. Maintaining, cleaning and replacing Common Area lighting facilities, including light standards, wires,

AJS2019 03/16/93 1600                    13

conduits, lamps, ballasts and lenses, time clocks and circuit breakers.

(v)     Landscaped Areas.    Maintaining and replacing all landscape of areas in an attractive and thriving condition, trimmed and weed-free.    Maintaining and replacing landscape planters, including those adjacent to exterior walls of buildings.    Modifying irrigation system to satisfy governmental water allocation or emergency requirements.

(vi)     Utility Lines.    Maintaining, cleaning, replacing and repairing any and all Utility Lines.

(vii)     Obstructions.   Keeping the Common Area free from any obstructions including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this OEA.

(viii)     Sidewalks. Maintaining, cleaning and replacing of all side-walks, including those adjacent and contiguous to buildings located within the Shopping Center.   Sidewalks shall be stream cleaned at least monthly and shall be swept at appropriate intervals.

(ix)     Supervisory Personnel. Providing professional supervisory personnel for the Common Area, if reasonably required.

(x)     Traffic.   Supervising traffic at entrances and exits to the Shopping Center and within the Shopping Center as conditions reasonably require in order to maintain an orderly and proper traffic flow.

Notwithstanding anything contained herein to the contrary, each Party shall maintain and repair, at its sole cost, in a clean, sightly and safe condition, any exterior shipping/receiving dock area, any truck ramp or truck parking area, and any refuse, compactor or dumpster area on its Tract.

(B)     In the event that any of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense with all due diligence; provided that no Party shall be required to expend more than $250,000 in Constant Dollars in excess of insurance proceeds which may be available (or which would have been available except for elections relating to deductibles or self-insurance for which the Party shall be responsible to contribute) for such repair or restoration. Notwithstanding the limitation set forth in the preceding sentence, a Party may require another Party to do such restoration work if the requiring Party has agreed in writing to pay the costs in excess of $250,000. Except to the extent limited by Section 5.4(D) hereof, in the event that such damage or destruction of Common Area is caused in whole or in part by another Party or by a third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution or damages.

AJS2019 03/16/93 1600            14

4.2    Building Improvements and Outside Sales Area.

(A)    After completion of construction, each Party covenants and agrees to maintain and keep, at its sole cost and expense, the building improvements and Outside Sales Area, if any, located on its Tract in a good state of repair and condition, in compliance with all governmental laws, rules, regulations, orders and ordinances exercising jurisdiction thereover, and in compliance with the provisions of this OEA, including the architectural theme. Each Party further agrees to store all trash and garbage in adequate containers, to locate such containers so that they are not readily visible from the parking area, and to arrange for regular removal of such trash or garbage.

(B)    In the event that any building improvements are damaged by fire or other casualty (whether insured or not), the Party upon whose Tract such building improvements are located promptly shall remove the debris resulting from such event and provide a sightly barrier, and within a reasonable time thereafter shall either (i) repair or restore the building improvements so damaged to a complete unit, such repair or restoration to be performed in accordance with all applicable provisions of this OEA, or (ii) erect other building improvements in such location, such construction to be performed in accordance with all applicable provisions of this OEA, or (iii) demolish the damaged portion and/or the balance of such building improvements and restore the cleared area to either a hard surface condition or a landscaped condition in which event the area shall be Common Area until a replacement building, if any, is erected. Such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one of such alternatives. Such Party shall give notice to each other Party within one hundred eighty (180) days from the date of such casualty of which alternative it elects.

## ARTICLE 5

## OPERATION OF THE SHOPPING CENTER

5.1    Uses.

(A)    No part of the Shopping Center shall be used for other than retail stores, offices, Restaurants or other non-industrial commercial purposes. "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to, financial institutions, real estate agencies, stock brokerages, title companies and escrow offices, travel and insurance agencies, and medical, dental and legal clinics. Not more than ten percent (10%) of the total Floor Area on the Lot 6 Tract nor more than ten percent (10%) of the Floor Area on the Opus Tract may be used for Retail Offices and/or Business Offices.

(B)    No use shall be permitted in the Shopping Center which is inconsistent with the operation of a retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:

(i)    Any use which emits an obnoxious odor, obnoxious noise, or obnoxious sound which can be heard or smelled outside of any building in the Shopping Center; provided, however, that the foregoing restriction shall not prohibit Menard from using loadspeaker and other broadcasting systems on the

AJS2019 03/16/93 1600                      15

roof of the Menard building and in the Menard Outside Sales Area so long as (a) such systems are incidental to the conduct of Menard's permitted use of its premises and are used in the ordinary course of Menard's business at the Shopping Center and (b) the use of such systems is comparable in type and character to that with respect to all or substantially all of the other stores operating under the name "Menard" in the greater Chicago metropolitan area.

(ii)     Any operation primarily used as a warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

(iii)    Any "second hand" store or "surplus" store;

(iv)    Any mobile home park, trailer court, labor camp, junkyard or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance);

(v)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

(vi)    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(vii)   Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to a laundromat which occupies three thousand (3,000) square feet or less of Floor Area or to on-site service oriented to pickup and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

(viii)  Any automotive service station that sells gasoline;

(ix)    Any automobile, truck, trailer or recreational vehicles sales, leasing, display or repair; provided, however, this prohibition shall not be applicable to a tire, battery and automobile repair facility which is ancillary to the primary use of an Occupant which occupies fifty thousand (50,000) square feet or more of Floor Area;

(x)     Any bowling alley or skating rink;

(xi)    Any theater;

(xii)   Any living quarters, sleeping apartments or lodging rooms;

AJS2019 03/16/93 1600                 16

(xiii)        Any veterinary hospital or animal raising facility (except that this prohibition shall not prohibit pet shops);

(xiv)        Any mortuary or funeral home;

(xv)        Any establishment selling or exhibiting pornographic materials;

(xvi)        Any bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds thirty percent (30%) of the gross revenues of such business;

(xvii)        Any health spa, fitness center or workout facility; provided, however, this prohibition shall not be applicable to one and only one health spa, fitness center or workout facility on each of the Owner Tract, the Opus Tract and the Target Tract which occupies twenty thousand (20,000) square feet or less of Floor Area;

(xviii)        Any flea market, amusement or video arcade, pool or billiard hall, car wash or dance hall; provided, however, this prohibition shall not be applicable to an arcade which is ancillary to the miniature golf course facility contained on the Owner Tract or to one and only one pool or billiard hall facility on each of the Owner Tract, the Opus Tract and the Target Tract which occupies five thousand (5,000) square feet or less of Floor Area;

(xix)        Any training or educational facility, including, but not limited to, beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(xx)        Any discotheque, night club and gymnasium;

(xxi)        Any animal boarding facilities;

(xxii)        Any operation whose principal use is a massage parlor, provided this shall not prohibit massages in connection with a beauty salon or a permitted health club or athletic facility;

(xxiii)        Any tattoo parlor; and

(xxiv)        Any church, school, day care center, or related religious or eductional facility.

(C)     No Party shall use or permit the use of Hazardous Materials (as hereinafter defined) on, about, under or in its Tract, or the Shopping Center, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws (as hereinafter defined). Each Party shall indemnify, protect, defend and hold harmless the other Parties from and against all claims, suits, actions, demands, costs, damages and losses of any kind, including, but not limited to, costs of investigation, litigation and remedial response arising out of any Hazardous Material used or permitted to be used by such Party, whether or not in the ordinary course of business.

For the purpose of this section, the term (i) "Hazardous Materials" shall mean petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law, and (ii) "Environmental Laws" shall mean all federal, state, county, municipal, local and other statutes, laws, ordinances and regulations which relate to or deal with human health or the environment, all as may be amended from time to time.

(D)     No merchandise, equipment or services, including, but not limited to, vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, that the foregoing prohibition shall not be applicable to (i) the storage of shopping carts on the Target Tract or the Opus Tract; (ii) the seasonal display and sale of bedding plants on the sidewalk in front of any building located on the Target Tract or the Opus Tract, or (iii) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties which may be withheld in their sole and absolute discretion; provided, however, that the display and sale of merchandise by Occupants of the Shopping Center on the sidewalks adjacent to the portions of the buildings occupied by such Occupants shall be permitted provided that such promotions shall in no event unreasonably interfere with the use of the sidewalks of the Shopping Center. In addition, if a recycling center or equipment is required by law to be located in the Shopping Center, the location of same shall be subject to the approval of the Approving Parties. Notwithstanding the foregoing, Target and Opus (or their respective Occupants) shall have the right to sell and display Christmas trees and related seasonal merchandise in the Common Area on their respective Tracts; provided, however, (a) the Common Area may be used for the sale and display of such merchandise only between November 15 of each calendar year and the following January 15, (b) no more than eighteen (18) parking spaces per Tract may be used for such purpose, and (c) the location of such sale and display area shall be subject to the approval of the Approving Parties provided that the Tree Area is hereby approved as such a location for Opus and its Occupants.

(E)     Neither the name "Target" or the trade name of any other business or trade conducted on the Target Tract shall be used to identify the Shopping Center or any business or trade conducted on the Owner Tract or the Opus Tract. Neither the name "Kohl's", the name "Menard" or the trade name of any other business or trade conducted on the Opus Tract shall be used to identify the Shopping Center or any business or trade conducted on the Owner Tract or the Target Tract. Until the Approving Parties agree upon a name change, the Shopping Center shall be called Rivercrest Plaza Shopping Center.

(F)     No Permittee shall be charged for the right to use the Common Area.

(G)     Each Party shall use its best efforts to cause the employees of the Occupants of its Tract to park their vehicles only on such Tract.

(H)     This OEA is not intended to, and does not, create or impose any obligation on a Party to operate, continuously operate or cause to be operated, a business or any particular business at the Shopping Center or on any Tract.

5.2     Lighting.

(A)     After completion of the Common Area lighting system on its Tract, each Party hereby covenants and agrees to keep its Tract fully illuminated each day from dusk to at least 10:00 p.m. unless the Approving Parties agree upon a different time. Each Party further agrees to keep any exterior building security lights on its Tract illuminated from dusk until dawn. During the term of this OEA, each Party grants an irrevocable license to each other Party for the purpose of permitting the lighting from its Tract to incidentally shine on the adjoining Tract.

(B)     Any Party ("Constructing Party") may install, with the consent of the affected Party ("Consenting Party"), a secondary wiring system, from the Constructing Party's Tract to the light standards on the Consenting Party's Tract, which would permit a portion or all of the lighting on the Consenting Party's Tract to be operated contemporaneously with the lighting on the Constructing Party's Tract. All costs and expenses associated with the installation, maintenance, replacement and operation of such secondary wiring, including the cost of energy to light any portion of the Consenting Party's Tract, shall be assumed and promptly paid by the Constructing Party. The Constructing Party shall submit to the Consenting Party appropriate plans and specifications for the installation of such secondary wiring system. The Consenting Party shall have thirty (30) days to approve or disapprove of such request, which approval shall not be unreasonably withheld. If the Consenting Party does not disapprove of the request within such 30-day period, approval shall be deemed given; if disapproval is given, the Constructing Party shall revise the request to accommodate the reasonable objections of the Consenting Party and then may resubmit such plans and specifications to the Consenting Party for its approval.

5.3     Occupant Signs.

(A)     No freestanding sign shall be permitted within the Shopping Center except for (i) one such sign (the "Pylon Sign") located in the area designated "Pylon Sign" on the Site Plan, which shall be used to identify the Shopping Center name, not more than one (1) retail Occupant of the Target Tract, the two (2) largest retail Occupants of the Opus Tract, and not more than one (1) retail Occupant of the Lot 6 Tract, (ii) one such sign located on the Lot 6 Tract to identify the Occupant of the Lot 6 Tract (the "Lot 6 Sign") and (iii) one other such sign (the "Target Sign") located on the Target Tract to identify the Occupant of the Target Tract and the Occupant of the Lot 6 Tract. The Pylon Sign shall be constructed by Owner in accordance with the design set forth on Exhibit G attached hereto and each Occupant identified on the Pylon Sign shall be entitled to use the space allocated for its use on Exhibit G. Target shall reimburse Owner for one-quarter (1/4) of the cost of constructing the Pylon Sign and Opus shall reimburse Owner for one-half (1/2) of the cost of constructing the Pylon Sign. If the Target Sign is constructed, Target shall be solely responsible for the installation, operation and maintenance thereof except that the Occupant of the Lot 6 Tract shall be responsible for the construction and installation of its identification panels. If the Lot 6 Sign is constructed, the Occupant of the Lot 6 Tract shall be solely responsible for the installation, operation and maintenance thereof. No products or services shall be advertised or promoted from the Pylon

Sign, the Lot 6 Sign or the Target Sign. Owner shall provide lighting for the Pylon Sign which is consistent with that provided for similar signs in other phases of Rivercrest Plaza Shopping Center. Owner shall be responsible for the operation and maintenance of the Pylon Sign and Owner shall repair and replace the Pylon Sign as necessary, but each Occupant identified on the Pylon Sign shall be responsible for the installation, repair and replacement of the panels attached to the Pylon Sign identifying such Occupant. Upon the expiration of the term of this OEA, Opus shall operate and maintain the Pylon Sign. The Approving Party for the Target Tract shall have the right to approve the design and size of all identification signs which are attached to the Pylon Sign, which approval shall not be unreasonably withheld or delayed; provided, however, it is agreed that any national merchant which occupies more than thirty thousand (30,000) square feet of Floor Area in the Shopping Center shall have the unqualified right to use in the space allocated to it on the Pylon Sign its standard prototype identification signage as the same exists from time to time. Target hereby grants and conveys to Owner and Opus for the use of Owner and Opus and the Occupants of the Owner Tract and the Opus Tract and their respective employees, agents and contractors a perpetual easement to maintain identification signs on the Pylon Sign in accordance with this Section 5.3(A) and a perpetual non-exclusive easement over and across the Outlot Easement Strip and the portion of the Target Tract lying northeasterly of the Outlot Easement Strip and southeasterly of the Outlot Tract to carry out the rights and obligations granted to and imposed upon Owner and such Occupants under this Section 5.3(A). Owner hereby grants and conveys to Target and Opus and the Occupants of the Target Tract and the Opus Tract and their respective employees, agents and contractors a perpetual, non-exclusive easement over and across the Common Area on the Outlot Tract to carry out the rights and obligations granted to and imposed upon Target and such Occupants under this Section 5.3(A).

(B) Any Occupant occupying less than twenty-five thousand (25,000) square feet of Floor Area may have only one (1) identification sign placed on the exterior of the building it occupies; provided, however, that if any such Occupant is located at the corner of a building, then such Occupant may have an identification sign on each side of such corner. Any Occupant occupying at least twenty-five thousand (25,000) square feet of Floor Area may have more than one identification sign placed on the exterior of the building it occupies. Each exterior identification sign attached to a building shall comply with the sign criteria for Rivercrest Shopping Center set forth on Exhibit H attached hereto; provided, however, that (i) existing signage on the Lot 6 Tract is approved and (ii) any Occupant occupying more than fifty thousand (50,000) square feet of Floor Area may maintain its standard prototype identification signage.

No Occupant of less than fifty thousand (50,000) square feet of Floor Area shall have an exterior sign which identifies leased departments and/or concessionaires operating under the Occupant's business or trade name, nor shall such sign identify specific brands or products for sale or services offered within a business establishment, unless such identification is used as part of the Occupant's trade name.

(C) Notwithstanding anything contained herein to the contrary, each Party shall be permitted to place within the Common Area located on its Tract directional signs or informational signs such as "Handicapped Parking", the temporary display of leasing information and the temporary erection of one sign identifying each contractor working on a construction job.

5.4    Insurance.

(A)    Each Party (as to its Tract only) shall at all times during the term of this OEA maintain or cause to be maintained in full force and effect Commercial General Liability Insurance with a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily or personal injury or death, and for property damage, arising out of any one occurrence; the other Parties and the Occupants of the other Parties' Tracts (if such Occupants occupy more than 50,000 square feet of Floor Area and if the Party maintaining insurance is given written notice of the identities of such Occupants) shall be "additional insureds" under such policy.

(B)    Each Party ("Indemnitor") covenants and agrees to defend, protect, indemnify and hold harmless each other Party ("Indemnitee") from and against all claims, including any actions or proceedings brought thereon, and all costs, losses, expenses and liability (including reasonable attorney's fees and costs of suit) arising from or as a result of the injury to or death of any Person, or damage to the property of any Person which shall occur on the Tract owned by such Indemnitor, except for claims caused by the negligence or willful act or omission of such Indemnitee, its licensees, concessionaires, agents, servants, or employees, or the agents, servants or employees of any licensee or concessionaire thereof.

(C)    Prior to commencing any construction activities within the Shopping Center, each Party shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages in Constant Dollars set forth below:

(i)    Workers' Compensation - statutory limits; and

(ii)    Employers' Liability - $500,000; and

(iii)    Comprehensive General/Commercial General Liability and Business Auto Liability as follows:

(a)    Bodily Injury - $1,000,000 per occurrence;

(b)    Property Damage - $1,000,000 per occurrence;

(c)    Independent Contractors Liability; same coverage as set forth in (a) and (b) above;

(d)    Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work;

(e)    "XCU" Hazard Endorsement, if applicable;

(f)    "Broad Form" Property Damage Endorsement;

(g)    "Personal Injury" Endorsements; and

(h)    "Blanket Contractual Liability" Endorsement.

If the construction activity involves the use of another Party's Tract, then the owner of such Tract and the Occupants of such Tract (if such Occupants occupy more than 50,000 square feet of Floor Area and if the Party maintaining insurance is given written notice of the identities of such Occupants) shall be additional insureds and such insurance shall provide that the same shall not be cancelled or materially reduced without at least thirty (30) days prior written notice to the named insureds and each additional insured. If such insurance is cancelled or expires, then the Constructing Party shall immediately stop all work on or use of the other Party's Tract until either the required insurance is reinstated or replacement insurance obtained.

(D)    Effective upon the commencement of construction of any building on its Tract and so long as such building exists, a Party shall carry, or cause to be carried, casualty insurance with "extended" or "all-risk" coverage, in the amount of one hundred percent (100%) of full replacement cost thereof (excluding footings, foundations or excavations). Each such policy shall contain a waiver of subrogation clause as to each other Party, and its agents and employees, to the extent either that (i) the Party obtaining the insurance and the waiver of subrogation clause, as aforesaid, has not waived or released any claim under this Section 5.4(D), or (ii) any such waiver or release is not effective or enforceable.

Each Party (the "Releasing Party") hereby releases and waives for itself, and each Person claiming by, through or under it, each other Party (the "Released Party") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Shopping Center, which loss or damage is of the type generally covered by the insurance required to be maintained under Section 5.4(D), irrespective either of any negligence on the part of the Released Party which may have contributed to or caused such loss, or of the amount of such insurance required to be carried or actually carried. Each Party agrees to use its best efforts to obtain, if needed, appropriate endorsements to its policies of insurance with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given. To the fullest extent permitted by law, each Party ("Indemnitor") covenants and agrees to indemnify, defend and hold harmless each other Party ("Indemnitee") from and against all claims asserted by or through any Permittees of the Indemnitor's Tract for any loss or damage to the property of such Permittee located upon the respective Indemnitor's Tract, which loss or damage is of the type generally covered by the insurance required to be maintained under Section 5.4(D), irrespective of any negligence on the part of the Indemnitee which may have contributed to or caused such loss.

(E)    All insurance required by this Section 5.4 shall be procured from companies licensed in the state where the Shopping Center is located and shall be rated by Best's Insurance Reports not less than A/X; provided, however, that insurance coverage maintained by Kohl's may have a rating by Best's Insurance Reports of not less than A-/X and insurance maintained by Hollywood Park may have a rating by Best's Insurance Reports of not less than A+. All insurance may be provided under (i) an individual policy covering this location, (ii) a blanket policy or policies which includes other liabilities, properties and locations of such Party; provided, however, that if such blanket commercial general liability insurance policy or policies contain a general policy aggregate of less than Twenty Million Dollars ($20,000,000) in Constant Dollars, then such insuring Party shall also maintain excess liability coverage necessary to establish a total liability insurance limit of Twenty Million Dollars ($20,000,000) in Constant Dollars, (iii) a plan of self-insurance, provided that any Party so self-insuring notifies the other Parties of its intent to self-insure and agrees that, upon the request of another

Party, it shall deliver to such other Party each calendar year a copy of its annual report that is audited by an independent certified public accountant which discloses that such Party has One Hundred Million Dollars ($100,000,000) in Constant Dollars or more of net current assets, or (iv) a combination of any of the foregoing insurance programs. So long as Kohl's and Menard are Occupants of the Opus Tract, Opus may satisfy its insurance obligations under this Section 5.4, as a Party, by causing Kohl's and Menard to maintain the insurance coverage which Opus is required to maintain under this Section 5.4; provided, however, (a) Kohl's may provide such insurance under a plan of self-insurance provided that Opus or Kohl's notifies the other Parties of Kohl's intent to self-insure and agrees that, upon the request of another Party, Kohl's shall deliver to such other Party each calendar year a copy of Kohl's annual report that is audited by an independent certified accountant which discloses Kohl's has Seventy-Five Million Dollars ($75,000,000.00) in Constant Dollars or more of net current assets and (b) Menard may provide such insurance under a plan of self-insurance provided that Opus or Menard notifies the other Parties if Menard's intent to self-insure and agrees that upon the request of another Party, Menard shall deliver to such other Party each calendar year a copy of Menard's annual report that is audited by a certified public accountant which discloses that Menard has a net worth of at least Fifty Million Dollars ($50,000,000.00) in Constant Dollars. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with Section 5.4, such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Fifty Thousand Dollars ($50,000.00) in Constant Dollars unless such Party complies with the requirements regarding self-insurance pursuant to (iii) above (except that Kohl's may maintain a deductible of up to One Hundred Thousand Dollars ($100,000.00)). Each Party agrees to furnish to any other Party requesting the same, a certificate(s) of insurance evidencing that the insurance required to be carried by such Party is in full force and effect.

The insurance required pursuant to this Section 5.4 shall include the following provisions:

(i) shall provide that the policy may not be canceled or materially reduced in amount or coverage without at least thirty (30) days' prior written notice by the insurer to each named insured and to each additional insured;

(ii) shall provide for severability of interests;

(iii) shall provide that an act or omission of one of the named insureds or additional insureds which would void or otherwise reduce coverage shall not reduce or void the coverage as to the other named insureds; and

(iv) shall provide for contractual liability coverage with respect to the indemnity obligations set forth in Section 5.4(B).

5.5   Taxes and Assessments.   Each Party shall pay, or cause to be paid, prior to delinquency all taxes and assessments with respect to its Tract, the buildings and improvements located thereon and any personal property owned or leased by such Party in the Shopping Center; provided, however, that if such taxes or assessments or any part thereof may be paid in installments, the Party responsible therefor may pay each such installment as and when the

same becomes due and payable. Nothing contained in this section shall prevent any Party from contesting at its cost and expense any such taxes and assessments with respect to its Tract in any manner such Party elects, so long as such contest is maintained with reasonable diligence and in good faith. At the time as such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all such taxes and assessments determined to be owing, together with all interest, penalties and costs thereon.

5.6 **Liens.** In the event any mechanic's lien is filed against the Tract of one Party as a result of services performed or materials furnished for the use of another Party, the Party permitting or causing such lien to be so filed agrees to cause such lien to be discharged prior to entry of final judgment (after all appeals) for the foreclosure of such lien and further agrees to indemnify, defend, and hold harmless the other Party and its Tract against liability, loss, damage, costs or expenses (including reasonable attorneys' fees and cost of suit) on account of such claim of lien. Upon request of the Party whose Tract is subject to such lien, the Party permitting or causing such lien to be filed agrees to promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting bond or other security as shall be required by law to obtain such release and discharge. Nothing herein shall prevent a Party permitting or causing such lien from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence. In the event such contest is determined adversely (allowing for appeal to the highest appellate court), such Party shall promptly pay in full the required amount, together with any interest, penalties, costs or other charges necessary to release such lien.

## ARTICLE 6

### MISCELLANEOUS

6.1 **Default.**

(A) The occurrence of any one or more of the following events shall constitute a material default and breach of this OEA by the nonperforming Party (the "Defaulting Party"):

    (i) The failure to make any payment required to be made hereunder within ten (10) days after issuance of a written notice by another Party (the "Non-Defaulting Party") specifying the nature of the default claimed, or

    (ii) The failure to observe or perform any of the covenants, conditions or obligations of this OEA, other than as described in (i) above, within thirty (30) days after the issuance of a written notice by the Non-Defaulting Party specifying the nature of the default claimed; provided, however, if such default cannot be cured within thirty (30) days, such thirty (30) day period shall be extended as may be necessary to cure such default so long as the Defaulting Party has commenced a cure within thirty (30) days and diligently prosecutes the cure to completion, but in no event shall such thirty (30) day period be extended for more than one hundred eighty (180) days.

AJS2019 03/16/93.1.600       24

(B)     With respect to any default under Section (A)-(ii) above, any Non-Defaulting Party shall have the right, but not the obligation, to cure such default by the payment of money or the performance of some other action for the account of and at the expense of the Defaulting Party; provided, however, that in the event the default shall constitute an emergency condition, the Non-Defaulting Party, acting in good faith, shall have the right to cure such default upon such advance notice as is reasonably possible under the circumstances or, if necessary, without advance notice, so long as notice is given as soon as possible thereafter. To effectuate any such cure, the Non-Defaulting Party shall have the right to enter upon the Tract of the Defaulting Party (but not into any building) to perform any necessary work or furnish any necessary materials or services to cure the default of the Defaulting Party. Each Party shall be responsible for the default of its Occupants. In the event that any Non-Defaulting Party shall cure a default, the Defaulting Party shall reimburse the Non-Defaulting Party for all costs and expenses incurred in connection with such curative action, plus interest as provided herein, within fifteen (15) business days of receipt of demand, together with reasonable documentation supporting the expenditures made.

(C)     Costs and expenses accruing and/or assessed pursuant to Section 6.1(B) above shall constitute a lien against the Defaulting Party's Tract. Such lien shall attach and take effect only upon recordation of a claim of lien in the office of the Recorder of Deeds of the County of the State in which the Shopping Center is located by the Party making the claim and such lien shall be subject and subordinate to advances made prior to such recordation under any mortgage or trust deed encumbering the Defaulting Party's Tract. The claim of lien shall include the following:

(i)     The name of the lien claimant;

(ii)    A statement concerning the basis for the claim of lien and identifying the lien claimant as a curing Party;

(iii)   An identification of the owner or reputed owner of the Tract or interest therein against which the lien is claimed;

(iv)    A description of the Tract against which the lien is claimed;

(v)     A description of the work performed which has given rise to the claim of lien and a statement itemizing the amount thereof; and

(vi)    A statement that the lien is claimed pursuant to the provisions of this OEA, reciting the date of recordation and the recorded document number hereof. The notice shall be duly verified, acknowledged and contain a certificate that a copy thereof has been served upon the Party against whom the lien is claimed, by personal service or by mailing pursuant to Section 6.4 below. The lien so claimed shall attach from the date of recordation solely in the amount claimed thereby and may be enforced in any manner allowed by law, including without limitation, a suit in the nature of a suit to foreclose a mortgage or mechanic's lien under the

applicable provisions of the law of the State in which the Shopping Center is located.

(D) No waiver by any Party of any default under this OEA shall be effective or binding on such Party unless made in writing by such Party and no such waiver shall be implied from any omission by a Party to take action in respect to such default. No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver. One or more written waivers of any default under any provision of this OEA shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained in this OEA.

(E) Each Non-Defaulting Party shall have the right to prosecute any proceedings at law or in equity against any Defaulting Party or any other Person violating or attempting to violate or defaulting upon any of the provisions contained in this OEA, and to recover damages for any such violation or default. Such proceeding shall include the right to restrain by injunction any violation or threatened violation by another of any of the terms, covenants or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for a breach of any such term, covenant, or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate. All of the remedies permitted or available to a Party under this OEA or at law or in equity shall be cumulative and not alternative, and invocation of any such right or remedy shall not constitute a waiver or election of remedies with respect to any other permitted or available right or remedy.

6.2    Interest.

Any time a Party shall not pay any sum payable hereunder to another within five (5) days of the due date, such delinquent Party shall pay interest on such amount from the due date to and including the date such payment is received by the Person entitled thereto, at the lesser of:

(i)        The highest rate permitted by law to be paid on such type of obligation by the Person obligated to make such payment or the Person to whom such payment is due, whichever is less; or

(ii)       Three percent (3%) per annum in excess of the corporate base rate from time to time publicly announced by Norwest Bank, Minneapolis National Association or its successor. If Norwest Bank, Minneapolis National Association or its successor shall cease to exist or shall cease to publicly announce a corporate base rate of interest, then the Approving Parties shall select a substitute rate of interest; until such substitute rate of interest is selected, a rate of twelve percent (12%) per annum shall be used.

6.3   Estoppel Certificate.

Each Party agrees that upon the written request (which shall not be more frequent than three (3) times during any calendar year) of any other Party, such party will issue to such Person, or its prospective mortgagee or successor, an estoppel certificate stating to the best of the issuer's knowledge that as of such date:

(i)     whether it knows of any default under this OEA by the requesting Person, and if there are known defaults, specifying the nature thereof;

(ii)    whether this OEA has been assigned, modified or amended in any way by it and if so, then stating the nature thereof; and

(iii)   whether this OEA is in full force and effect.

Such statement shall act as a waiver of any claim by the Person furnishing it to the extent such claim is based upon facts contrary to those asserted in the statement and to the extent the claim is asserted against a bona fide encumbrancer or purchaser for value without knowledge of facts to the contrary of those contained in the statement, and who has acted in reasonable reliance upon the statement. Notwithstanding anything contained herein to the contrary, the issuance of an estoppel certificate shall in no event subject the Person furnishing it to any liability whatsoever, notwithstanding the negligent or otherwise inadvertent failure of such Person to disclose correct and/or relevant information, nor shall such issuance be construed to waive any rights of the issuer to challenge acts committed by other Parties for which approval by the Approving Parties was required but not sought or obtained. If Owner fails to issue an estoppel certificate as required hereunder within fifteen (15) days after written request therefor, then Owner shall be deemed to have stated that (A) it knows of no default under this OEA by the requesting Person, (B) this OEA has not been assigned, modified or amended in any way other than for such assignments, modifications or amendments which are of record, and (C) this OEA is in full force and effect.

6.4   Notices.

All notices, demands and requests (collectively, the "notice") required or permitted to be given under this OEA must be in writing and shall be deemed to have been given as of the date such notice is (i) delivered to the Party intended, (ii) delivered to the then current address of the Party intended, or (iii) rejected at the then current address of the Party intended, provided such notice was sent prepaid. The initial addresses of the Parties shall be:

Target:          Dayton Hudson Corporation
                 Target Stores-Real Estate
                 Attn: Property Administration
                 33 S. Sixth Street
                 Minneapolis, MN 55402

AJS2019 03/16/93 1600                    27

Owner:  
Glenn R. Heyman, Esq.  
Dannen, Crane, Heyman & Simon  
135 South LaSalle Street  
Suite 1540  
Chicago, Illinois 60603  

and  

The Sakura Bank, Limited  
227 West Monroe Street  
Suite 4700  
Chicago, Illinois 60606  
Attn: David Van Singel  

Opus:  
Opus North Corporation  
9700 Higgins Road  
Suite 910  
Rosemont, Illinois 60018  
Attention: John M. Crocker, Jr.  

Upon at least ten (10) days' prior written notice, each Party shall have the right to change its address for notice purposes to any other address within the United States of America.

6.5 **Approval Rights.**

(A) Nothing contained in this OEA shall limit the right of a Party to exercise its business judgment, or act, in a subjective manner, with respect to any matter as to which it has specifically been granted such right, or the right to act in its sole discretion or sole judgment, whether "objectively" reasonable under the circumstances, and any such exercise shall not be deemed inconsistent with any covenant of good faith and fair dealing otherwise implied by law to be part of this OEA; and the Parties intend by this OEA to set forth their entire understanding with respect to the terms, covenants, conditions and standards pursuant to which their obligations are to be judged and their performance measured.

(B) Unless otherwise herein provided, whenever a consent or approval (the "approval") is required, such approval shall not be unreasonably withheld or delayed. Unless provision is made for a specific time period, each response to a request for an approval shall be given by the Party to whom directed within thirty (30) days of receipt of such request. Any disapproval shall be in writing and the reasons therefor shall be clearly stated. If a response is not given within the required time period, the requested Party shall be deemed to have given its approval.

(C) If the Approving Parties' approval is requested, unanimous approval must be given.

6.6 **Condemnation.** In the event any portion of the Shopping Center shall be condemned, the award shall be paid to the Party owning the land or the improvement taken, except that (i) if the taking includes improvements belonging to more than one Party, such as Utility Lines or signs, the portion of the award allocable thereto shall be used to relocate, replace or restore such jointly owned improvements to a useful condition, and (ii) if the taking

AJS2019 03/16/93 1600        28

includes easement rights which are intended to extend beyond the term of this OEA, the portion of the award allocable to each such easement right shall be paid to the respective grantee thereof. In addition to the foregoing, if a separate claim can be filed for the taking of any other property interest existing pursuant to this OEA which does not reduce or diminish the amount paid to the Party owning the land or the improvement taken, then the owner of such other property interest shall have the right to seek an award for the taking thereof.

6.7     Binding Effect. The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall inure to the benefit of and be binding upon the signatories hereto and their respective successors and assigns who become Parties hereunder. This OEA is not intended to supersede, modify, amend or otherwise change the provisions of any prior instrument affecting the land burdened hereby.

6.8     Construction and Interpretation.

(A)     This OEA and the Exhibits hereto contain all the representations and the entire agreement between the Parties with respect to the subject matter hereof. Any prior negotiations, correspondence, memoranda or agreements are superseded in total by this OEA and Exhibits hereto. This OEA has been fully negotiated at arms length between the signatories hereto, and after advice by counsel and other representatives chosen by such signatories, and such signatories are fully informed with respect thereto; no such signatory shall be deemed the scrivener of this OEA; and, based on the foregoing, the provisions of this OEA and the Exhibits hereto shall be construed as a whole according to their common meaning and not strictly for or against any Party.

(B)     Whenever required by the context of this OEA, (i) the singular shall include the plural and vice versa, and the masculine shall include the feminine and neuter genders and vice versa; and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, terms or matter.

(C)     The captions preceding the text of each article and section are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of this OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

(D)     Invalidation of any of the provisions contained in this OEA, or of the application thereof to any person by judgment or court order shall in no way affect any of the other provisions hereof or the application thereof to any other person and the same shall remain in full force and effect.

(E)     This OEA may be amended by, and only by, a written agreement signed by all of the then current Approving Parties and shall be effective only when recorded in the county and state where the Shopping Center is located; provided, however, that no such amendment shall impose any materially greater obligation on, or materially impair any right of, a Party or its Tract without the consent of such Party. No consent to the amendment of this OEA shall

ever be required of any Occupant or Person other than the Parties, nor shall any Occupant or Person other than the Parties have any right to enforce any of the provisions hereof.

(F) This OEA may be executed in several counterparts, each of which shall be deemed an original. The signatures to this OEA may be executed and notarized on separate pages and when attached to this OEA shall constitute one complete document.

6.9 Negation of Partnership. None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.10 Not a Public Dedication. Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Tract or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

6.11 Excusable Delays. Whenever performance is required of any Person hereunder, such Person shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, or any cause beyond the reasonable control of such Person, then the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this section shall not operate to excuse any Person from the prompt payment of any monies required by this OEA.

6.12 Mitigation of Damages. In all situations arising out of this OEA, all Parties shall attempt to avoid and mitigate the damages resulting from the conduct of any other Party. Each Party hereto shall take all reasonable measures to effectuate the provisions of this OEA.

6.13 OEA Shall Continue Notwithstanding Breach. It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind or otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or trust deed made in good faith and for value as to any part of the Shopping Center. However, such limitation shall not affect in any manner any other rights or remedies which a Party may have hereunder by reason of any such breach.

6.14 Time. Time is of the essence of this OEA.

6.15 No Waiver. The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that Party may have hereunder, at law or in equity and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions.

## ARTICLE 7

## TERM

7.1 **Term of this OEA.** This OEA shall be effective as of the date first above written and shall continue in full force and effect until 11:59 p.m. on December 31, 2033; provided, however, that the easements referred to in Article II hereof which are specified as being perpetual or as continuing beyond the term of this OEA shall continue in force and effect as provided therein. Upon termination of this OEA, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of this OEA, except as relates to the easements mentioned above, shall terminate and have no further force or effect; provided, however, that the termination of this OEA shall not limit or affect any remedy at law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this OEA prior to the date of such termination.

## ARTICLE 8

## EXCULPATION

8.1 **Exculpation of Owner.** This OEA is executed by American National Bank and Trust Company of Chicago, not personally but as Trustee under Trust No. 108951-00, in the exercise of the power and authority conferred upon and vested in it as such Trustee (and said Trustee hereby warrants that it possesses full power and authority to execute this OEA). It is expressly understood and agreed by and between the parties hereto, anything herein to the contrary notwithstanding, that each and all of the representations, covenants, undertakings, warranties and agreements herein made on the part of the Trustee while in form purporting to be the representations, covenants, undertakings, warranties and agreements of said Trustee are nevertheless made and intended not as personal representations, covenants, undertakings, warranties and agreements by the Trustee or for the purpose or with the intention of binding Trustee personally but are made and intended for the purpose of binding only the trust property, and this OEA is executed and delivered by said Trustee not in its own right, but solely in the exercise of the power conferred upon it as said Trustee; and that no personal liability or personal responsibility is assumed by or shall at any time be asserted or enforceable against said Trustee on account of this OEA or on account of any representations, covenants, undertakings, warranties or agreements of said Trustee in this OEA contained either express or implied, all such personal liability, if any, being expressly waived and released.

8.2 **Limited Liability of Owner.** Any and all liabilities and obligations of Owner under this OEA shall be satisfied solely out of the interest of Owner in the Owner Tract and in no event shall Owner be personally liable for the satisfaction of any such liabilities and obligations.

8.3 **Limited Liability of Opus.** Any and all liabilities and obligations of Opus under this OEA shall be satisfied solely out of the interest of Opus in the Opus Tract and in no event shall Opus be personally liable for the satisfaction of any such liabilities and obligations.

8.4 **Limited Liability of Target.** Any and all liabilities and obligations of Target under this OEA shall be satisfied solely out of the interest of Target in the Target Tract and in no event shall Target be personally liable for the satisfaction of any such liabilities and obligations.

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed by their duly authorized representatives effective as of the day and year first above written.

AMERICAN NATIONAL BANK AND
TRUST COMPANY OF CHICAGO, not
personally but as Trustee under
Trust No. 108951-00 ("Owner")

By: _____ MICHAEL WHELAN
Name: _____
Title: _____

ATTEST: _____ Gregory S. Kasprzyk

Name: _____
Title: _____ ASSISTANT SECRETARY

DAYTON HUDSON CORPORATION
("Target")

By: _____
Name: _Bob    McMahon__
Title: _Sr. Vice President_
       _Target Stores_
ATTEST:

Name: _____
Title: _____

OPUS NORTH CORPORATION ("Opus")

By: _____
Name: _JAMES P NYGAARD_
Title: _CEO_

ATTEST:

Name: _____
Title: _____

AJS2019 03/16/93 1600

STATE OF ILLINOIS    )
                )    SS.
COUNTY OF COOK   )

    I, _____ L. M. SOVIENSKI _____, a Notary Public in and for said County, in the State aforesaid, do hereby certify that J. Michael Whelan _____ Vice President of American National Bank and Trust Company of Chicago and ____ Gregory S. Kasprzyk ____, Assistant Secretary of said Bank, who are personally known to me to be the same persons whose names are subscribed in the foregoing instrument as such _____ Vice President and Assistant Secretary, respectively, appeared before me this day in person and acknowledged that they signed and delivered said instrument as their own free and voluntary act and as the free and voluntary act of said Bank, as Trustee under Trust No. 108951-00, for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this 25th day of March, 1993.

_____
Notary Public

My Commission Expires:_____

OFFICIAL SEAL
L.M. SOVIENSKI

AJS2019 03/16/93 1600

STATE OF ILLINOIS    )
                           )  SS.
COUNTY OF COOK     )

I, _Susan R Proffitt_, a Notary Public in and for said County, in the State aforesaid, do hereby certify that _James P. Nygaard_ , _CEO_ ~~President~~ of Opus North Corporation ~~and~~ ~~Secretary of said corporation,~~ who ~~are~~ _is_ personally known to me to be the same person~~s~~ whose name~~s~~ ~~are~~ subscribed in the foregoing instrument as such _CEO_ ~~President and~~ ~~Secretary, respectively,~~ appeared before me this day in person and acknowledged that ~~they~~ signed and delivered said instrument as ~~their~~ _his_ own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 25th day of March, 1993.

```
" OFFICIAL SEAL "
SUSAN R. PROFFITT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/19/93
```

_Susan R Proffitt_
Notary Public

My Commission Expires:_____

AJS2019 03/16/93 1600

STATE OF MINNESOTA       )
                             )   SS
COUNTY OF HENNEPIN      )

      On this 22nd day of March, 1993, before me, a Notary
Public within and for said County, personally appeared Bob
McMahon, to me personally known, who, being by me duly sworn, did
say that he is the Sr. Vice President of Target Stores, a division
of Dayton Hudson Corporation, and that said instrument was signed
on behalf of said corporation by authority of its Board of
Directors and Bob McMahon acknowledged said instrument to be the
free act and deed of said corporation.

Notary Public

LINDA E. JOHNSON
NOTARY PUBLIC—MINNESOTA
HENNEPIN COUNTY
My Comm. Expires Jan. 8, 1997

## CONSENT AND SUBORDINATION

For Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, as mortgagee of the real estate legally described on Exhibit B, Exhibit C and Exhibit D hereto under the terms of a mortgage dated November 21, 1989 and recorded November 27, 1989 with the Recorder of Deeds of Cook County, Illinois as Document No. 89562417, as amended, hereby joins in the execution of the foregoing Operation and Easement Agreement and further acknowledges and agrees that all of its right, title and interest under said mortgage is and shall be subject and subordinate in all respects to the easements, covenants and agreements set forth in the foregoing Operation and Easement Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Consent and Subordination as of the 25ᵗʰ day of March, 1993.

THE SAKURA BANK, LIMITED f/k/a
MITSUI-TAIYO KOBE BANK, LTD.

By: _____
Name: Teruhisa Kato
Title: General Manager

ATTEST:

Name: _____
Title: _____

AJS2019 03/16/93 1600

STATE OF ILLINOIS     )
                           )   SS

COUNTY OF COOK     )

*General Manager*

I, SUSON R PROFFIT a notary public in and for said county, in the state aforesaid, do hereby certify that TOYOHISO KATO, ~~President of The Sakura Bank, Limited f/k/a Mitsui-Taiyo Kobe Bank, Ltd., and~~ _____, ~~Secretary of said Bank~~, who ~~are~~ personally known to me to be the same person~~s~~ whose name~~s~~ ~~are~~ subscribed in the foregoing instrument as such _____ ~~President and~~ _____ ~~Secretary,~~ ~~respectively,~~ appeared before me this day in person and acknowledged that ~~they~~ *his* signed and delivered said instrument as ~~their~~ own free and voluntary act and as the free and voluntary act of said Bank for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 25th day of March, 1993.

"OFFICIAL SEAL"
SUSAN R. PROFFITT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/19/93

_____
Notary Public

My Commission Expires: _____

AJS2019 03/16/93 1600

## EXHIBIT A TO OPERATION AND EASEMENT AGREEMENT

### LEGAL DESCRIPTION OF THE TARGET TRACT

LOT 8 IN RIVERCREST OF CRESTWOOD, BEING A SUBDIVISION OF PART OF THE EAST 1/2 OF SECTION 33, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, AS DOCUMENT NO. 91661848.

<u>EXHIBIT B TO OPERATION AND EASEMENT AGREEMENT</u>

<u>LEGAL DESCRIPTION OF THE LOT 6 TRACT</u>

LOT 6 IN RIVERCREST OF CRESTWOOD, BEING A SUBDIVISION OF PART OF THE EAST 1/2 OF SECTION 33, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, AS DOCUMENT NO. 91661848.

<u>EXHIBIT C TO OPERATION AND EASEMENT AGREEMENT</u>

<u>LEGAL DESCRIPTION OF THE OUTLOT TRACT</u>

LOT 9 IN RIVERCREST OF CRESTWOOD, BEING A SUBDIVISION OF PART OF THE EAST 1/2 OF SECTION 33, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, AS DOCUMENT NO. 91661848.

AJS2019 03/16/93 .1600.                    C-1

<u>EXHIBIT D TO OPERATION AND EASEMENT AGREEMENT</u>

<u>LEGAL DESCRIPTION OF THE DETENTION POND TRACT</u>

LOT 7 IN RIVERCREST OF CRESTWOOD, BEING A SUBDIVISION OF PART OF THE EAST 1/2 OF SECTION 33, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, AS DOCUMENT NO. 91661848.

AJS2019 03/16/93 1600          D-1

<u>EXHIBIT E TO OPERATION AND EASEMENT AGREEMENT</u>

<u>LEGAL DESCRIPTION OF THE OPUS TRACT</u>

LOTS 5 AND 23 IN RIVERCREST OF CRESTWOOD, BEING A SUBDIVISION OF PART OF THE EAST 1/2 OF SECTION 33, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991, WITH THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, AS DOCUMENT NO. 91661848.

## EXHIBIT F TO OPERATION AND EASEMENT AGREEMENT

## SUBMISSION GUIDELINES

1. During the conceptual design phase, the constructing Party shall submit to the other Parties the following:

    A.    Site Design Documents to Indicate the Following:

- Parking configurations and car parking count
- Typical bay width and stall dimensions
- Drive widths
- Setbacks
- Curb cuts
- Spot elevations or rough contours
- Rough landscape scope
- Lighting pole locations
- Preliminary utility strategies

    B.    Building Design Single Line Plans to Indicate the Following:

- Exterior wall configuration
- Doors and store front extent
- Canopies and overhangs
- Probable column locations at exterior and abutting our building on interior

    C.    Exterior Elevation Drawings to Indicate the Following:

- Opaque wall areas with doors and store fronts

2. After approval has been granted of a Party's conceptual design phase submitted in accordance with the guidelines specified in 1 above, the constructing Party shall submit final design phase plans to the other Parties as follows:

A.   **Site Design Documents Delineating Information Outlined in the Concept Phase with the Following Added Detail:**

- Refined grading plans

- Selected lighting fixtures and resultant lighting levels in foot-candles

- Landscaping showing generic planting materials and locations

- Proposed paving section designs and location

- Utility layouts, including hydrants and sizes proposed

- Proposed details for curbs, site structures, manholes, etc.

- Proposed site signage designs and location

B.   **Building Design Plans Delineating Information Outlined in the Concept Phase with the Following Added Detail:**

- Exterior wall thicknesses

- Structural columns or bearing walls at building exterior and proposed foundation design at adjoining wall between abutting buildings

- Where common footings are to be shared, provide wall or column load information for design of such footings

- Proposed roof plan showing slopes and location of penthouses or other major mechanical equipment

- References of key flashing details of roof to adjoining building

C.   **Exterior Elevation Drawings Delineating Information Outlined in the Concept Phase with the Following Added Detail:**

- Proposed building sign standards

- Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the elevations)

- Proposed large scale details of key section conditions to show exterior design intent

- Major penthouses or rooftop equipment profiles

- Features such as special masonry patterns, bands or special materials and textures

- Rain leaders or scuppers

       •   Wall sections at various exterior locations, including at the demising wall to the adjoining building with key vertical dimensioning

3.   If a building is to have a through-the-wall pedestrian access connection to an adjoining building, then the final design phase submission shall also include (to the owner of such adjoining building) the following:

       •   Plans of the pedestrian mall circulation showing any variations in floor elevations

       •   Elevations/sections of the proposed mall space showing store front sign bulkheads and key dimensions

       •   Proposed ceiling design including special features such as variations in height or skylights

       •   Floor material patterns

       •   Landscaping and mall seating areas

       •   Proposed interior sign guidelines

       •   Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the plans or elevations)

       •   Proposed large scale details of key section conditions to show interior design intent

4.   The constructing Party shall provide the other Parties with a complete set of bid documents for the building and/or improvements to be located upon its Tract.

EXHIBIT G TO OPERATION AND EASEMENT AGREEMENT

DESIGN OF PYLON SIGN





EXHIBIT H TO OPERATION AND EASEMENT AGREEMENT

SIGN CRITERIA

EXHIBIT ~~B~~ H ~~B~~

SIGN POLICY CRITERIA:

~~This Exhibit B is hereby attached to Lease Agreement dated _____, 1992.~~

A.    GENERAL NOTES

1.    All sign graphics are subject to approval of Lessor.

2.    The Lessor will define the dimensions, materials, colors, mounting detail and type of illumination for all signs.

3.    The Lessee will be allowed one sign location outside its Leased Premises in a location designated by Lessor, unless otherwise approved by Lessor.

a)  One (1) single-face sign of three-dimensional, individual letters, with plexi-glass self-illuminated faces mounted on the canopy sign band. Signs shall be directly fastened to the sign band and shall not project more than 6". The letters may not extend to more than 24" in height, or extend more than 70% of the width of the Leased Premises. One symbol or capital letter may extend to 36 inches. Letter style shall be the choice of the Lessee, but the Lessor will review and approve. Sign shall be store identity only and shall not be flashing, moving, audible or smoke emitting. No products may be advertised on the facia sign. Any deviation must be approved in writing by the Lessor.

4.    Lessee's lettering on doors, windows or show windows may not be illuminated and may not exceed 4" in height, unless otherwise approved in writing by the Lessor. No sign may be affixed to the doors, windows or show windows. No signs are permitted that flash or emit smoke or noise.

5.    Lessee shall have store names and street numbers painted on service doors in 4" high letters and numbers. Signs shall be 5'-0" above the sills and numbers shall be 5'-8" above sills.

6.    Lessee shall be responsible for making patches and repairs to dryvit sign band and the canopy ceiling when erecting, maintaining or removing signs.

7.    Lessee will send three copies of blueprint of signs to the City/or Village, Attention: Building Commissioner for their approval. Lessee will also send two copies or blueprints of signs to Lessor, C/O - First National Realty & Development Company, Inc., Attn: Leasing Department, 415 N. LaSalle Street, 7th Floor, Chicago, Illinois 60610 for written approval.

8.    All sides of letters to match frame work of windows.

9.    Final stamped approval by local city authorities must be obtained prior to installation of sign(s).

H-1

10. At termination of lease, Lesse will remove sign and must pato
    or repair all holes to bring front facia in front of Shoppi:
    Center back to original appearance.

H-2

## EXHIBIT X TO OPERATION AND EASEMENT AGREEMENT

### SITE PLAN





# H&W RISK MANAGEMENT

### A DIVISION OF HAAS & WILKERSON INSURANCE

October 5, 2015

ELIZABETH MURPHY
BRIXMOR PROPERTY MANAGEMENT
40 SKOKIE BOULEVARD, #600
NORTHBROOK, IL  60062

RE:  Our Client:  Wright Entertainment Group Inc. dba Hollywood Park
     Claim No.:   JY15J0046310
     Loss Date:   2-1-12
     Plaintiff:   Burlington Coat Factory of Illinois, LLC aso Crystine Gomez

Dear Ms. Murphy:

H&W Risk Management is the claims administrator for ACE American Insurance Company, the general liability insurer of Wright Entertainment Group Inc. dba Hollywood Park.

Wright Entertainment Group, Inc. d/b/a Hollywood Park, Inc., an Illinois corporation, is a tenant on the premises identified as Rivercrest Shopping Center, located at or near 13120 Rivercrest Drive, Crestwood, Illinois.  On February 1, 2012, a woman named Crystine Gomez slipped on snow and ice in the parking lot on her way to work at the Burlington Coat Factory premises.  She parked her car in a parking space bordering Wright Entertainment Group's premises and nearby her employer, Burlington Coat Factory's front door. Mrs. Gomez made a claim for workman's compensation and was paid money by her employer's workman's compensation carrier.  That workman's compensation carrier has now sued Dell Corporation and Roy Erikson Outdoor Maintenance, Inc. to recover the money paid to Gomez.  The workman's compensation carrier asserts that Dell and Erikson caused the snow and ice condition in the parking lot, where she fell by negligently snowplowing the common area parking lot. Dell is the Burlington Coat Factory landlord. The testimony of the Dell-hired snowplow service, Mr. Erikson, was taken. He has said under oath that he does not plow the area where Gomez fell but that the Wright Entertainment Group/Hollywood- hired snowplow services does the work. We attach to this letter, three photos marked by Crystine Gomez showing where she parked and where she fell. We also attach a drawing by Mr. Erikson showing what he claims-he does not plow in the parking spaces immediately adjacent to the Wright/Hollywood property.

Thereafter, Dell Corporation filed Third Party Complaints against Wright Entertainment Group, Target Stores, and Target's snowplow service, Ferrandino & Sons.  As a result,

4300 Shawnee Mission Parkway · Fairway, Kansas 66205 · Phone 877.747.5449 · Fax 913.676.9364 · www.hwins.com

INSURING YOUR SUCCESS



Wright Entertainment Group by its counsel retained by Haas and Wilkerson, has been defending this lawsuit. Wright's counsel met with Mark Picard and Chris Paliga, Wright/Hollywood's principals, at the premises. Counsel was provided a copy of a lease dated October 5th and 6th, 2010 which we attach to this letter. Further, we are advised by the principals at Wright Entertainment Group that they pay, as a part of their rental fee, money to Brixmor for Brixmor's service to snowplow the parking lot and for Brixmor's hire to otherwise maintain the parking lot spaces surrounding the Wright Entertainment Group property, near where this incident happened. It's our understanding that Brixmor, as property manager for Wright/Hollywood, conducts snowplow and other common area maintenance services for a fee from Wright/Hollywood (CAM). We have been advised that Wright/Hollywood does not hire or do snow plowing of the parking lot surrounding their premises and never has because it leaves that up to Brixmor.

The lease document dated October 5, 6, 2010 has a Centro Properties Group logo and we understand that a name change occurred such that Centro Properties is now Brixmor. The lease contains a section, ¶ 9, entitled EASEMENT ENFORCEMENT. In this section, Brixmor asserts that it is a party to the easement of March 25, 1993: "Landlord acknowledges that it is a party to that certain written Easement dated March 25, 1993 as Doc No. 93223679 in the Cook County Recorder of Deeds ("Easement")" (Third Amendment to Centro lease of October 5, 2010, paragraph 9, pg. 3 of 7). Article IV of the Easement of March 25, 1993 entitled MAINTENANCE AND REPAIR, paragraph 4.1 entitled Common Area, subparagraph 4.1(ii) reads as follows:

> **Debris and Refuse.** Periodic removal of all papers, debris, filth, refuse, ice and snow (2" on surface), including daily vacuuming and broom sweeping to the extent necessary to keep the Common Area in a first class, clean and orderly condition..."

The terms of the easement to which the Brixmor organization is a party, require Brixmor to address this lawsuit against its tenant, Wright/Hollywood. On behalf of Wright/Hollywood, we hereby tender the defense and indemnity of the Third Party Complaint against Wright/Hollywood to Brixmor. Kindly contact the undersigned upon receipt.

Very truly yours,

*Kevin D. Prophet*

Kevin D. Prophet, MBA, AIC
Senior Claims Representative
913-676-9284

cc:    Centro Bradley SPE 3, LLC
       c/o Centro Properties Group
       Attn: Office of General Counsel, Property
       420 Lexington Avenue, 7th Floor
       New York, NY 10170

2

Centro Bradley SPE 3, LLC
c/o Centro Properties Group
Attn:   Legal Department
40 Skokie Boulevard, Suite 600
Northbrook, IL  60062

3

From: 8186382395    Page: 2/2    Date: 4/11/2016 9:35:27 AM 0

# GALLAGHER BASSETT SERVICES

P.O BOX 2934, Clinton, IA 52733-2934
Phone: (508) 948-3646 ⊓ Facsimile: (908) 394-3299

April 7, 2016

H&W Risk Management
Attn: Kevin Prophet
4300 Shawnee Mission Pkwy
Fairway, KS 66205

RE:
Our Client:     **Brixmor Property Group (Rivercrest Shopping Center)**
Company:        **Federal Insurance Co,**
Your Claim:     JY15J0046310
Case:           **Crystine Gomez**
Claim#          **008047-013244-GB-01**
Loss Date:      **2-1-12**

Dear Mr. Prophet,

Please be advised that we have received your letter asking our client Brixmor Property Group to accept a tender for your client Wright Entertainment Group Incorporated d/b/a Hollywood Park in this litigated case. The facts of this case as I understand them are the plaintiff slipped and fell in the parking lot on snow/ice.

Please be advised that we will defend and indemnify Wright Entertainment Group Incorporated d/b/a Hollywood Park pursuant to the lease agreement with respect to the captioned matter. We are assigning Jack Hsu with Christensen Ehret at 135 S. LaSalle St., Suite 4200, Chicago IL 60603. Their phone number is 312-214-5355. We agree to pay reasonable attorney's fees from October 5, 2015, the first notice of this tender. Please submit your tender fee bills for our review.

Please do not hesitate to contact me directly at 508-948-3646 with any questions you may have.

Sincerely,

Greg Lamberti
Senior Resolution Manager
508-948-3646
Greg_Lamberti@gbtpa.com



EXHIBIT
6